J-A14028-18

2018 PA Super 230

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                         :         PENNSYLVANIA
                                         :
            v.                           :
                                         :
                                         :
QUADIR EDWARDS                           :
                                         :
            Appellant                    : No. 2433 EDA 2016

Appeal from the Judgment of Sentence June 23, 2016
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0001191-2015


BEFORE:   GANTMAN, P.J., SHOGAN, J., and PLATT*, J.

OPINION BY SHOGAN, J.:                           **FILED AUGUST 16, 2018**

     Appellant, Quadir Edwards, appeals from the June 23, 2016 judgment

of sentence entered in the Court of Common Pleas of Philadelphia County

following a bench trial.  We affirm.

     In reliance on the testimony at the suppression hearing, the trial court

summarized the facts of the crime as follows:

          On January 20, 2015 at approximately 1:20 a.m., officers
     were traveling on a routine patrol southbound on the 3500 block
     of Kensington Avenue.  N.T. 3/14/16 at 5-6.  Officer Kellar
     testified that while he was the recorder (passenger) in the patrol
     car, he noticed a "black male limping in the bike lane on the west
     side of the street."  Id.  When [Appellant] was observed, he was
     heading towards the patrol car about twenty feet away.  Id. at 6-
     7.  As [Appellant] got closer to the vehicle, Officer Kellar noticed
     that [Appellant] had "blood coming down the left side onto the
     white long johns."  Id. at 7-8.

          After noticing the blood on [Appellant's] leg, Officer Kellar
     attempted to get [Appellant's] attention, but [he] ignored the

_____
*   Retired Senior Judge assigned to the Superior Court.

officer and kept "limping at a fast pace." Id. at 8. [Appellant] continued to ignore the officers as they reversed their vehicle and tried to talk to [Appellant]. Id. at 9. Officer Kellar exited the vehicle and told [Appellant] to stop multiple times. Id. at 9. Eventually, [Appellant] stopped and faced Officer Kellar. Id. However, [Appellant] continued to back away from the officers, even after he was informed that they were only interested in bringing him to the hospital for his leg injury. Id. at 10. [Appellant] told the officer that he was shot; "He said a Hispanic male around the corner shot him and that we should go look for him." Id. As Officer Kellar approached [Appellant], he noticed that [Appellant] was reaching for his right jacket pocket while backing away. Id. 10–11. Based on his observations of [Appellant] and his three and a half years of experience as an officer, Officer Kellar believed that [Appellant] was hiding something in his right jacket pocket that he did not want him to find.[4] Id. at 12–13. Officer Kellar testified that this area was a high crime area known for "drug sales, stabbings, shootings, and robberies." Id. at 13. Once [Appellant] reached into his jacket, Officer Kellar stopped him and frisked the outer layer of [Appellant's] clothing. Id. at 14. On the right jacket pocket, Office Kellar felt a hard object which he immediately knew was a gun.[5] Id. [Appellant] was then placed in handcuffs and transported to Temple Hospital because of the wound on his left leg. Id. at 16–17. While en route to the hospital, there was a flash[6] sent out concerning a "black male wearing a black North Face jacket with a white hood underneath it." Id. at 22. [Appellant] was wearing "a black jacket with a white hood underneath it." Id.

[4] Officer Kellar: "At that time, like I said, I believed he was reaching for something, you know, possibly a weapon, possibly, you know, drugs in his pocket to get rid of it." Id. at 14.

[5] The gun "was loaded with 12 rounds, and there was a spent shell casing that was jammed inside the chamber of the gun... There was no bullet in the gun. The casing that holds the bullet was still jammed inside the gun. So, essentially, if you were to fire a handgun and nothing were to restrict the slide from going back, that spent shell casing would eject from the handgun. But in this case, through my experience, it would indicate that that slide did not fully go all the way back, which would mean it would

jam the spent shell casing inside. But the bullet, itself, was fired." Id. at 22–23.

[6] There was no objection to this testimony by defense counsel. Officer Cunningham eventually testified that the flash information was for a man who was shot. Id. at 38.

Next, Officer Cunningham was called by defense counsel[7] to testify. Id. at 30. Officer Cunningham testified that his partner, Officer Kellar, alerted him as to [Appellant] who was walking down the street towards them and bleeding from his leg. Id. at 31–32. When [Appellant] was invited to get into the car to be taken to the hospital, he insisted that the officers get the Hispanic male who shot him while he was involved in a robbery. Id. at 32. When Officer Cunningham was approaching [Appellant], Officer Kellar was already recovering a gun from [Appellant]. Id. Officer Cunningham also testified that in one of his reports he said, "[T]he male walked up to us and stated that he got shot and told us to get the doer." Id. at 34-35. This statement was what his partner told him because he did not actually interact with [Appellant] while he was driving the car, but he did see the blood on his leg. Id. at 35-36.

[7] Officer Cunningham was called with Commonwealth's objection because defense counsel had not subpoenaed the officer as her witness. Id. at 29–30.

[Appellant] was arrested after he was treated in the hospital. Id. at 39. There was no testimony that [Appellant] indicated that he did not want aid from the police. Id. at 57. After an investigation,[8] it was found that [Appellant] shot himself in the leg. N.T. 6/23/16, at 18.

[8] The results of the investigation were not given at trial, but defense counsel did not object to its admission during sentencing. Id. at 18.

Trial Court Opinion, 5/23/17, at 2–4.[1]

The trial court summarized the procedural history as follows:

On January 20, 2015, [Appellant] was arrested and charged with: 1) Carrying a Firearm without a License and; 2) Carrying a Firearm in Public in Philadelphia.

On March 14, 2015, [Appellant] proceeded with a waiver trial before this [c]ourt and was found guilty for both of the charges against him.

On June 23, 2016, [Appellant] was sentenced to: 1) Carrying [a firearm] without a License—two (2) to four (4) years incarceration at CSI Chester with anger management, drug treatment and vocational training followed by three years reporting probation to run consecutively to the Carrying in Public charge; 2) Carrying in Public—one (1) to two (2) years [incarceration followed by two years] reporting probation to run consecutively for the Carrying without a License charge. Id. at 53-54.

On July 11 2016, [Appellant's] post-sentence motion was denied.[2]

Trial Court Opinion, 5/23/17, at 1–2 (footnotes omitted). Appellant filed a timely notice of appeal; both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following issues on appeal:

1. Did not the court err in denying the [Appellant's] motion to suppress evidence in that the [Appellant] was stopped in the absence of reasonable suspicion or probable cause, and all evidence subsequently obtained by [Appellant] was fruit of this illegal stop?

_____

[1] The was no testimony at the suppression hearing that the police activated their emergency lights when they encountered Appellant.

[2] The docket indicates the motion was denied on July 7, 2016.

2.A. Did not the court err by taking into account as part of its sentencing determination the fact that [Appellant's] mother did not testify on behalf of [Appellant] at sentencing, and then reaching conclusions from this observation which were adverse to [Appellant], since the reasons for the absence of such testimony were not necessarily adverse to [Appellant] and the court's conclusions as to why [Appellant's] mother did not testify could only be speculative at best?

2.B. Further, did not the court err when it refused to allow defense counsel to address the adverse conclusions reached by the court on account of the absence of a statement by [Appellant's] mother, and did not the court thus violate due process by preventing [Appellant] from presenting evidence and/or argument at sentencing?

Appellant's Brief at 4.

Appellant's first issue relates to the trial court's denial of Appellant's suppression motion, and the second and third issues relate to his sentence. The standard of review we apply when considering an order denying a suppression motion is settled:

An appellate court may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. *Commonwealth v. Russo*, 594 Pa. 119, 934 A.2d 1199, 1203 (2007) (citing *Commonwealth v. Boczkowski*, 577 Pa. 421, 846 A.2d 75 (2004)). Where the record supports the factual findings of the trial court, the appellate court is bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. *Id.* However, it is also well settled that the appellate court is not bound by the suppression court's conclusions of law. *Id.* (citing *Commonwealth v. Duncan*, 572 Pa. 438, 817 A.2d 455 (2003)).

With respect to factual findings, we are mindful that it is the sole province of the suppression court to weigh the credibility of the witnesses. Further, the suppression court judge is entitled to believe all, part or none of the evidence presented. However, where

> the factual determinations made by the suppression court are not supported by the evidence, we may reject those findings. Only factual findings which are supported by the record are binding upon this Court.

> ***Commonwealth v. Benton***, 440 Pa. Super. 441, 655 A.2d 1030, 1032 (1995) (citations omitted). In addition, we are aware that questions of the admission and exclusion of evidence are within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. ***Commonwealth v. Freidl***, 834 A.2d 638, 641 (Pa. Super.2003).

***Commonwealth v. Nguyen***, 116 A.3d 657, 663–664 (Pa. Super. 2015).

Appellant argues the trial court erred in failing to suppress evidence because the police stopped Appellant without reasonable suspicion or probable cause. Appellant's Brief at 18. He contends the Commonwealth failed to present evidence at the suppression hearing to prove that exigent circumstances "in the cloak of the emergency aid doctrine" existed, which would excuse the absence of reasonable suspicion or probable cause, at the time police stopped Appellant. Appellant's Brief at 17.

The three levels of interaction between citizens and police are: mere encounter, investigative detention, and custodial detention.

> A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond.

> In contrast, an investigative detention, by implication, carries an official compulsion to stop and respond, but the detention is temporary, unless it results in the formation of probable cause for arrest, and does not possess the coercive conditions consistent with a formal arrest. Since this interaction has elements of official compulsion[,] it requires reasonable suspicion of unlawful activity. In further contrast, a custodial detention occurs when the nature,

- 6 -

duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest.

*Nguyen*, 116 A.3d at 664 (quoting *Commonwealth v. DeHart*, 745 A.2d 633, 636 (Pa. Super. 2000) (internal citations and quotation marks omitted)).

Our Supreme Court recently expounded upon the community caretaker doctrine[3] in *Commonwealth v. Livingstone*, 174 A.3d 609, 634 (Pa. 2017), addressing for the first time "the public service or the emergency aid exceptions under the community caretaking doctrine."[4,5]  Noting that the United States Supreme Court first recognized a community caretaking exception to the warrant requirement in *Cady v. Dombrowski*, 413 U.S. 433 (1973), the Pennsylvania Supreme Court explained that the doctrine encompassed three specific exceptions: 1) the emergency aid exception; 2) the automobile impoundment/inventory exception; and 3) the public servant exception, "also sometimes referred to as the public safety exception."

---

[3]  Our Supreme Court observed that it previously acknowledged the "community care-taking functions" of police in *Commonwealth v. Lagenella*, 83 A.3d 94 (Pa. 2013), but it had not previously addressed the public service or the emergency aid exceptions.  *Livingstone*, 174 A.3d at 627.

[4]  We note that Appellant filed his brief in this case on October 27, 2017, exactly one month before our Supreme Court filed its decision in *Livingstone*. In addition, the trial court filed its opinion on May 23, 2017, more than six months before the Court filed its decision in *Livingstone*.

[5]  While each section of the opinion garnered different votes, we note that all sections of *Livingstone* obtained a majority.

*Livingstone*, 174 A.3d at 626–627. The *Livingstone* Court advised, "**Each of the exceptions contemplates that the police officer's actions be motivated by a desire to render aid or assistance, rather than the investigation of criminal activity**." *Id*. at 627 (emphasis added). After examining case law concerning the community caretaker doctrine from the courts of more than twenty-five of our sister states, our Supreme Court clarified that it "likewise recognize[d] that the role of police is not limited to the detection, investigation, and prevention of criminal activity. Rather, police officers engage in a myriad of activities that ensure the safety and welfare of our Commonwealth's citizens. Indeed, we want to encourage such laudable activity." *Id*. at 627–628, 629. In doing so, the Court quoted descriptions of the doctrine offered by the Supreme Courts of Delaware and Tennessee, as follows:

> The modern police officer is a "jack-of-all-emergencies," with "'complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses'; by default or design he is also expected 'to aid individuals who are in danger of physical harm,' 'assist those who cannot care for themselves,' and 'provide other services on an emergency basis.'" To require reasonable suspicion of criminal activity before police can investigate and render assistance in these situations would severely hamstring their ability to protect and serve the public.

*Livingstone*, 174 A.3d at 628–629 (quoting *Williams v. State*, 962 A.2d 210, 216 (Del. 2008)).

> Police officers wear many hats: criminal investigator, first aid provider, social worker, crisis intervener, family counselor, youth mentor and peacemaker, to name a few. They are charged with the duty to protect people, not just from criminals, but also from

- 8 -

accidents, natural perils and even self-inflicted injuries. We ask them to protect our property from all types of losses—even those occasioned by our own negligence. They counsel our youth. They quell disputes between husband and wife, parent and child, landlord and tenant, merchant and patron and quarreling neighbors. Although they search for clues to solve crime, they also search for missing children, parents, dementia patients, and occasionally even an escaped zoo animal. They are society's problem solvers when no other solution is apparent or available.

*Id*. at 629 (quoting *State v. McCormick*, 494 S.W.3d 673, 686 (Tenn. 2016)).

The *Livingstone* Court held as follows:

[We] first hold that, in order for the public servant exception of the community caretaking doctrine to apply, police officers must be able to point to specific, objective, and articulable facts that would reasonably suggest to an experienced officer that a citizen is in need of assistance.

* * *

Second, we hold that, in order for the public servant exception of the community caretaking doctrine to apply, the police caretaking action must be independent from the detection, investigation, and acquisition of criminal evidence. As noted above, this is a common requirement to warrantless searches under all three exceptions of the community caretaking doctrine, including the emergency aid exception . . . .

* * *

[I]t is not realistic or wise to expect an officer to ignore the nature of his or her role in law enforcement—or its inherent dangers—in order for the public servant exception of the community caretaking doctrine to apply. Thus, so long as a police officer is able to point to specific, objective, and articulable facts which, standing alone, reasonably would suggest that his assistance is necessary, a coinciding subjective law enforcement concern by the officer will not negate the validity of that search under the public servant exception to the community caretaking doctrine.

\* \* \*

Finally, we hold that, in order for the public servant exception to apply the level of intrusion must be commensurate with the perceived need for assistance. . . . To summarize, in order for a seizure to be justified under the public servant exception to the warrant requirement under the community caretaking doctrine, the officer must point to specific, objective, and articulable facts which would reasonably suggest to an experienced officer that assistance was needed; the police action must be independent from the detection, investigation, and acquisition of criminal evidence; and, based on a consideration of the surrounding circumstances, the action taken by police must be tailored to rendering assistance or mitigating the peril.

*Livingstone*, 174 A.3d at 634–637.

In the instant case, the trial court concluded that the police properly stopped Appellant because they had a reasonable basis to believe that an emergency existed. The trial court noted:

> [Police] observed [Appellant] limping down the street with blood running down his left leg. [Appellant] also admitted to being shot and there was blood coming from his left leg. N.T. at 7–8. Moreover, [Appellant] admitted to the officers that he was shot and the police should be looking for the shooter instead of trying to help him. The search of [Appellant's] jacket was not primarily motivated by an intent to arrest and seize evidence.

Trial Court Opinion, 5/23/17, at 10. The trial court also concluded that there was probable cause to arrest [Appellant]:

> [Appellant] was walking down the street at one o'clock in the morning, in a high crime area, with blood running down his leg. N.T. at 5–8. [Appellant] actually admitted to being shot. Id. at 10. When [Appellant] was approached by the officers who were trying to give him medical aid, he kept blading his body away from the cops and reaching for his jacket pocket, a sign that he was hiding something from the police officer. Id. at 10-13.

*Id*.

- 10 -

Appellant maintains that the relevant cases containing circumstances consistent with the emergency aid doctrine, where the warrant requirement properly was set aside, had these common threads among them: there was reason to believe that: 1) a true emergency existed which required fast action, and 2) there was information to be gained by the warrantless acts of the police to enable the police to meet the emergency. Appellant's Brief at 22–24. Contrary to those similarities, Appellant argues here that the Commonwealth's evidence at the suppression hearing failed to satisfy either criterion. *Id*. at 24. Appellant avers that no emergency existed, and thus, he maintains he was seized without reasonable suspicion or probable cause. *Id*. at 30.

We disagree and conclude that police acted reasonably and pursuant to the community caretaking doctrine when observing Appellant limping, with a bloody leg, at 1:20 a.m., in that they approached and offered Appellant medical assistance. N.T., 3/14/16, at 6–10. Indeed, as the Commonwealth points out, "the officers would have been remiss in carrying out their duties had they ignored a limping pedestrian who was bleeding from the leg at 1:20 a.m. in a neighborhood known to them for its high levels of shootings and other violent crime." Commonwealth Brief at 12–13. Examining the criteria established in *Livingstone* to determine whether the public servant exception of the community caretaking doctrine applied in this case, we observe that Philadelphia Police Officer James Kellar identified specific, objective, and articulable facts that would reasonably suggest to an

experienced officer that a citizen was in need of assistance. Indeed, in his reply brief, Appellant concedes that fact. Appellant's Reply Brief at 6.

Second, the police caretaking action was independent from the detection, investigation, and acquisition of criminal evidence. The provision of aid to Appellant and transportation to the hospital was independent of the subsequent, contemporaneous concern that arose as Officer Kellar spoke to Appellant, who "blade[d] his body away" from the officer as he "placed his right hand into his right jacket pocket." N.T., 3/14/16, at 11. We repeat the *Livingstone* Court's observation that "it is not realistic or wise to expect an officer to ignore the nature of his or her role in law enforcement . . . [S]o long as a police officer is able to point to specific, objective, and articulable facts which, standing alone, reasonably would suggest that his assistance is necessary, a coinciding subjective law enforcement concern by the officer will not negate the validity of that search under the public servant exception to the community caretaking doctrine." *Livingstone*, 174 A.3d at 637. The suppression testimony, which the trial court credited, was consistent; the sole purpose of this police interaction with Appellant was to render aid. Initially, Appellant was limping, bleeding and unresponsive. N.T., 3/14/16, at 10 ("I saw blood coming from his leg. We were trying to figure out what happened to him so we could give him medical attention or transport him to the hospital."). Once more, Appellant concedes that this criterion also was met in this case. Appellant's Reply Brief at 7.

Finally, we conclude the third criterion established in **Livingstone** was fulfilled in that the level of intrusion was commensurate with the perceived need for assistance. We are confident that police action herein was "tailored to rendering assistance or mitigating peril." **Livingstone**, 174 A.3d at 637. Police merely stopped to offer aid. Appellant's initial action in continuing to limp forward as Officer Kellar called out does not reveal whether he merely did not hear the officer or was attempting to avoid him. When Officer Kellar approached Appellant, Appellant stated that he had been shot, he turned away and reached for his pocket. N.T., 3/14/16, at 10–11. The officer was entitled to conduct a safety frisk.

Thus, we conclude that police herein reasonably acted pursuant to the public service exception. What began as a mere encounter ripened into an investigative detention. Therefore, the trial court properly denied Appellant's motion to suppress.

We next consider Appellant's sentencing claims, which challenge the discretionary aspects of his sentence. Challenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right, and his challenge in this regard is properly viewed as a petition for allowance of appeal. **See** 42 Pa.C.S. § 9781(b); **Commonwealth v. Tuladziecki**, 522 A.2d 17 (Pa. 1987); **Commonwealth v. Rhoades**, 8 A.3d 912, 916 (Pa. Super. 2010). An appellant challenging the discretionary aspects of his sentence must satisfy a four-part test to invoke this Court's jurisdiction.

*Commonwealth v. Tejada*, 107 A.3d 788, 797 (Pa. Super. 2015). We evaluate: (1) whether Appellant filed a timely notice of appeal; (2) whether Appellant preserved the issue at sentencing or in a motion to reconsider and modify sentence; (3) whether Appellant's brief includes a concise statement of the reasons relied upon for allowance of appeal; and (4) whether the concise statement raises a substantial question that the sentence is appropriate under the Sentencing Code. *Commonwealth v. Carrillo-Diaz*, 64 A.3d 722, 725 (Pa. Super. 2013). An appellant must articulate the reasons the sentencing court's actions violated the Sentencing Code. *Commonwealth v. Moury*, 992 A.2d 162 (Pa. Super. 2010).

In the instant case, Appellant filed a timely appeal. However, Appellant did not raise the issues in his post-sentence motion, and the Commonwealth has asserted waiver of the claims. Commonwealth Brief at 19, 25. The Commonwealth also maintains that Appellant failed to preserve the issues by contemporaneous objection at the sentencing hearing. *Id*.

In his reply brief, Appellant responds that he preserved the issues at the sentencing hearing. Appellant's Reply Brief at 9. It is true that when the trial court acknowledged the presence of Appellant's mother at the sentencing hearing and noted that she did not "speak on behalf of [Appellant], defense counsel attempted to "briefly address that" observation. N.T. (Sentencing), 6/23/16, at 51–52. The court declined the interruption and stated, "No, you should have addressed it then. I'm doing my closing now with regard to the

sentencing." *Id*. at 52. Appellant filed an extensive post-sentence motion on July 1, 2016. He did not assert any issue related to the trial court's comments about Appellant's mother. Post-Sentence Motion, 7/1/16. At argument before this Court, counsel admitted he failed to assert the issue in his post-sentence motion.

This Court has explained countless times the necessity to present issues to the trial court first in order to preserve them for review. The *Tejada* Court made clear, "for any claim that was required to be preserved, this Court cannot review a legal theory in support of that claim unless that particular legal theory was presented to the trial court." *Tejada*, 107 A.3d at 799 (quoting *Commonwealth v. Rush*, 959 A.2d 945, 949 (Pa. Super. 2008)). It is not just that an objection is made, but the theory in support of the objection must be offered to the trial court so that it can rule upon it. Here, defense counsel attempted to respond to the trial court's observation but was not permitted to do so. Thus, while it is preferential that the issue had been proffered in the post-sentence motion, we will not find waiver under these specific facts.

Continuing, then, with our analysis of the four-part test to determine whether to invoke this Court's jurisdiction, we note that Appellant's brief includes a concise statement of the reasons relied upon for allowance of appeal. Appellant's Brief at 15–16. Therefore, we consider whether the

concise statement raises a substantial question that the sentence is appropriate under the Sentencing Code.

A determination as to whether a substantial question exists is made on a case-by-case basis. ***Commonwealth v. Derry***, 150 A.3d 987 (Pa. Super. 2016). This Court will grant the appeal "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." ***Id.*** at 991 (citing ***Commonwealth v. Sierra***, 752 A.2d 910, 912–913 (Pa. Super. 2000)).

In his Rule 2119(f) statement, Appellant argues that the trial court relied on an improper factor, Appellant's mother's failure to testify at sentencing, in sentencing Appellant. Appellant's Brief at 15. We conclude that Appellant has raised a substantial question. ***See Commonwealth v. P.L.S.***, 894 A.2d 120, 127 (Pa. Super. 2006) (holding that a claim that the sentencing court considered impermissible factors raises a substantial question).

> Our standard of review in sentencing appeals is well settled:
>
> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

***Commonwealth v. Mann***, 957 A.2d 746, 749 (Pa. Super. 2008).

- 16 -

A sentencing judge has broad discretion in determining a reasonable penalty, and appellate courts afford the sentencing court great deference, as it is the sentencing court that is in the best position to "view the defendant's character, displays of remorse, defiance, or indifference, and the overall effect and nature of the crime." ***Commonwealth v. Walls***, 926 A.2d 957, 961 (Pa. 2007) (citation omitted). When imposing a sentence, the sentencing court must consider "the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S. § 9721(b). As we have stated, "[A] court is required to consider the particular circumstances of the offense and the character of the defendant." ***Commonwealth v. Griffin***, 804 A.2d 1, 10 (Pa. Super. 2002). In particular, the sentencing court should refer to the defendant's prior criminal record, his age, personal characteristics, and his potential for rehabilitation. ***Id***.

Moreover, it is well settled that sentencing courts are not bound by the Sentencing Guidelines; the Guidelines are merely advisory. ***Commonwealth v. Sheller***, 961 A.2d 187, 190 (Pa. Super. 2008) (citation omitted). The sentencing court may deviate from the Sentencing Guidelines, because they are one factor among many that the court must consider when imposing a sentence. ***Id***. (citation omitted). The sentencing court "may depart from the [G]uidelines if necessary, to fashion a sentence which takes into account the protection of the public, the rehabilitative needs of the defendant, and the

gravity of the particular offense as it relates to the impact on the life of the victim and the community." *Id*. (internal quotation marks and citation omitted).

In this case, the trial court had the benefit of a presentence investigation report ("PSI"), which included a mental health evaluation. N.T. (Sentencing), 6/23/16, at 4–5. "Our Supreme Court has determined that where the trial court is informed by a [PSI], it is presumed that the court is aware of all appropriate sentencing factors and considerations, and that where the court has been so informed, its discretion should not be disturbed." *Commonwealth v. Ventura*, 975 A.2d 1128, 1133 (Pa. Super. 2009) (citation omitted). "The sentencing judge can satisfy the requirement that reasons for imposing sentence be placed on the record by indicating that he or she has been informed by the [PSI]; thus properly considering and weighing all relevant factors." *Id*. (citing *Commonwealth v. Fowler*, 893 A.2d 758, 766-767 (Pa. Super. 2006)).

At the sentencing hearing, the court made the following statement:

> The [c]ourt's also taken into consideration that the mother is present, and the [c]ourt has watched the mother and has be [sic] observant of the mother, and the [c]ourt must take into consideration the fact that mom did not speak on behalf of [Appellant]. In fact, mom has looked away from [Appellant] and the [c]ourt for the whole proceeding of his presentation. At this period of time, the mother did dab her eyes with a tissue. The mother did not say anything positive with regard to [Appellant].

N.T. (Sentencing), 6/23/16, at 51.

Appellant asserts that the court drew an adverse inference from the mother's failure to speak on Appellant's behalf at sentencing. Appellant's Brief at 31–32. Thus, he claims the court considered an improper sentencing factor. In Part 2 of this issue, Appellant contends that the trial court's denial at the hearing of counsel's attempt to address the court's reference to Appellant's mother violated Appellant's due process rights. *Id*. at 34.

The Commonwealth avers that the trial court's mention of Appellant's mother was "plainly insignificant in contrast with the numerous other, more serious considerations taken into account . . . such as his repeated recidivism and lack of remorse." Commonwealth Brief at 19. The Commonwealth underscores Appellant's six arrests, "including three for crimes involving firearms, and two convictions." *Id*. at 20. The Commonwealth also points to Appellant's arrest in three separate cases after posting bail in the present case. More specifically, "he was arrested and convicted for selling drugs based on an April 2015 arrest occurring only two months after he posted bail." *Id*.

Moreover, the Commonwealth emphasizes that defense counsel extensively argued that Appellant was "'supported by his mother who is in the room,' that he 'was living with his mother prior to being incarcerated on these matters,' and that 'his mother is involved.' Indeed, he continued to emphasize his mother's role in his supposed future rehabilitation. ('[H]is mother's here supporting him'); ('He has his mother who is here.'). . . ." Commonwealth Brief at 21 (internal citations omitted). The Commonwealth posits that the

trial court's reference to Appellant's mother also was to point out the support she presented by being available to him "even though" she did not speak on his behalf. The Commonwealth presents an extensive list of all of the factors the court considered. Commonwealth Brief at 24. Moreover, Appellant, during his allocution to the court, emphasized, *inter alia*, his family's support, and he specifically referenced his mother, brother, and sister.

We do not find the trial court considered an improper factor in sentencing Appellant. First, as argued by the Commonwealth, there is no question that the trial court was responding to defense counsel's strenuous and continual emphasis on Appellant's allegedly significant family support. N.T. (Sentencing), 6/23/16, at 8–9, 44. Appellant, as well, emphasized in his allocution to the court that his mother was available to him as a support. **Id**. at 48. Moreover, the trial court considered all of the factors that weighed on the court's decision:

> I heard the allocution of [Appellant]. The [c]ourt has listened to the presentation by . . . counsel for [Appellant], as well as heard the Commonwealth's presentation. The [c]ourt has reviewed the presentencing report as well as the mental health evaluation attached thereto. The [c]ourt has reviewed his own notes of how the facts took place. . . .
>
> The [c]ourt is well aware of the fact [Appellant] has six arrests, two convictions, three violations of parole, and two commitments. The [c]ourt is aware of his children. He graduated from Frankford High school. The [c]ourt is also well aware of the admission that [Appellant] made to the presentence workers that he has been gainfully employed by selling drugs and that's how he has been supporting himself.

The [c]ourt did not find in reviewing the presentencing report or any other indications of the fact as [defense counsel] testified that [Appellant] was employed detailing cars. The [c]ourt has no evidence of that. The [c]ourt is aware of the fact that he has two children. The [c]ourt is well aware of the fact that [Appellant] admitted that while incarcerated [he] smoked K-2.

The [c]ourt's also aware of the fact that the probation report indicates that [Appellant] would be a poor candidate for community supervision given his inability to stay arrest free while on probation.

Knowing that [Appellant] was found guilty of an offense, the [c]ourt is appalled that three days later he comitted [sic] a crime and two months later there's a gun charge.

After reviewing the presentencing report, recalling my notes from the hearing, and everything that was presented today for this sentencing, the Court has taken into account the statutory facts I'm required to review by law, the protection of the public, the gravity of the offense, the impact on the victims and the community, and rehabilitative needs of [Appellant].

N.T. (Sentencing), 6/23/16, at 48–51. It was at this point that the court referenced Appellant's mother, as quoted *supra*. In its Pa.R.A.P. 1925(a) opinion, the trial court noted that its comments were:

based on the body language and observations of the court while the sentencing hearing was held. This information was a valid consideration on the nature of the relationship between [Appellant] and [his] mother to help for a proper consideration regarding his ties to the community and family support. Further, [Appellant] did not allege that this consideration was a misapplication of the law, manifestly unjust or the result of prejudice or ill will by the [c]ourt. From the record, there is no indication that the [c]ourt was biased toward [Appellant] or misapplied the law with regard to his sentence since he was sentenced within the sentencing guideline recommendations and within the mandatory maximum for the charges against [Appellant].

Trial Court Opinion, 5/23/17, at 14–15.

After review, we discern no abuse of discretion. We conclude that there is no indication that the trial court relied on an improper factor in fashioning Appellant's sentence. Rather, it made an observation in response to defense counsel's argument and Appellant's representations during allocution. Accordingly, it is our determination that there was no abuse of discretion, and we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


Date: *8/16/2018*