J-S40021-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                                                 :              PENNSYLVANIA
                                                 :
           v.                               :
                                               :
EDWARD L. RAMAGE                 :
                                               :
             Appellant                :      No. 2854 EDA 2023

Appeal from the Judgment of Sentence Entered October 31, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001962-2021

BEFORE: STABILE, J., McLAUGHLIN, J., and LANE, J.

MEMORANDUM BY McLAUGHLIN, J.:            **FILED JANUARY 30, 2025**

Edward L. Ramage appeals from the judgment of sentence entered following his convictions for unlawful contact with a minor, endangering the welfare of a child, corruption of minors, indecent assault of a person less than 13 years of age, and involuntary deviate sexual intercourse with a child.[1] He challenges the sufficiency and weight of the evidence and the discretionary aspects of his sentence. We affirm.

The trial court set forth the following factual history:

> Mr. Ramage repeatedly sexually abused and raped his great-niece,[1] L.B., when she was between the ages of approximately four to seven years old. L.B. routinely stayed with her great-grandmother, Ms. Darlene Ramage, from the time she was four or five years old until she was six or seven years old. Ms. Celina Berroa, L.B.'s mother, had an arrangement where L.B. stayed with Ms. Ramage on

---

[1] 18 Pa.C.S.A. §§ 6318(a)(1), 4304(a)(1), 6301(a)(1)(ii), 3126(a)(7), 3123(b), respectively.

weekdays and sometimes weekends while Ms. Berroa worked and attended school. During this time, multiple people lived in Ms. Ramage's house, including her brother, Mr. Ramage. While L.B. stayed with Ms. Ramage, L.B. was sometimes left alone with Mr. Ramage.

[1] Mr. Ramage is the brother of L.B.'s great-grandmother. In some vernacular, this relationship may also be called great-grand-niece, or great-great-niece.

While Mr. Ramage had access to L.B., he would repeatedly engage her in various sexual activities. Often, he would do these things while others were in the house. Events happened mainly in the kitchen and less frequently in Mr. Ramage's bedroom. Mr. Ramage would initiate these various encounters by instructing her to come over to him.

L.B. recounted several specific instances which occurred in the kitchen. Several times, Mr. Ramage made her touch his penis with her hands until he ejaculated. In one incident, Mr. Ramage had her touch his penis using an object she could only describe as a "salad grabber." Ex. C-8 (part 2), at 3:36-4:45, 17:00-22:00; N.T., 12/20/2022, at 85-86, 87 (describing his ejaculation as "kind of like pus"). In another incident, Mr. Ramage told her to put her mouth on his penis, but she does not remember complying with that instruction. N.T., 12/20/2022, at 91 ("So[,] since I have that then everything else goes blank after that, I can't be sure if I did it or not."). During most of these incidents, he would give her instructions both before and during the encounters on how she should touch and engage with his body. Ex. C-8 (part 2), at 0:00-3:35 ("He would tell me to put my hands out. . ." and "there" and "squeeze on it"). These incidents occurred "again, and again, and again, and again" in a kitchen corner that obscured people from being seen by people in other rooms.

L.B. also recounted an incident in the kitchen when an adult walked in while Mr. Ramage was unbuckling his belt. Mr. Ramage quickly re-buckled the belt. The person gave Mr. Ramage a strange look and exited to the backyard. L.B. does not remember who that person was.

L.B. recounted several specific instances which occurred in Mr. Ramage's bedroom. Mr. Ramage would call L.B. into

his bedroom and lock her inside. Once inside, he would bend her over his bed, pull her underwear down, and anally penetrate her with his penis. He would cover her mouth with his hands or tape. She estimated that there were 5-10 incidents in the bedroom.

The sexual abuse came to light two years after L.B. moved back permanently with her mother. Mr. Ramage attempted to sexually abuse her again. He attempted to bribe her and threaten her to participate in sexual acts, but she pushed him away. She subsequently disclosed the sexual abuse to her great-grandmother. Ms. Ramage reported the matter to L.B.'s mother, who took L.B. to the hospital, and the police were called. Approximately one month after the disclosure, L.B. began to hallucinate a "dog man" figure in the middle of the night.

Trial Court Opinion, filed Mar. 6, 2024, at 1-4 (some footnotes and citations to record omitted).

Following a bench trial, the court found Ramage guilty of unlawful contact with a minor, endangering the welfare of a child, corruption of minors, indecent assault of a person less than 13 years of age, and involuntary deviate sexual intercourse with a child. After an SVP hearing, the trial court found Ramage was not a sexually violent predator.

The court held a sentencing hearing, where it considered the presentence investigation report, the Commonwealth's sentencing memorandum, Ramage's mitigation packets, the guideline sentence forms, statements made on behalf of Ramage, and the victim's testimony. The court sentenced Ramage to an aggregate sentence of 387 to 774 months' incarceration followed by three years' probation. It placed the following reasons on the record:

So the things that I've considered in making my sentence include the statutory factors that I'm required to consider including the need for the protection of the public, the gravity of the offense in relation to the impact on the victim's life and the community and the rehabilitative needs of Mr. Ramage.

I've also considered all of the information submitted to me in preparation for the sentencing, which I have carefully reviewed, which include the presentence report and investigation of prior record score; the [Sexual Offenders Assessment Board ("SOAB")] assessment and the entirety of the evidence from the SVP hearing; the sentencing memo submitted by the Commonwealth and Defense; the mitigation memo submitted by the Defense; statements made by the Commonwealth and Defense Counsel in this hearing; statements made by Mr. Ramage including the statement relayed through his attorney; statements made by the victim and on behalf of the victim.

So there was no victim impact statement testimony, but the [c]ourt has considered the victim's testimony during trial, as well as the sentence guidelines.

The [c]ourt has prepared and viewed the sentence guideline form for each offense, and reviewed those earlier. We're going to call that Court Exhibit 1 for purposes of the sentencing. No risk assessment was performed because all of these crimes occurred prior to July 1st of 2020.

I am actually really surprised by the Commonwealth's recommendation in this case. You know, all of the information available to the [c]ourt during the course of the trial, it's clear that this was an on-going experience that this child went through over and over again in different variations, that these were not isolated incidents. And I understand that, as Defense pointed out, he was only charged with particular crimes. And perhaps the evidence would have sustained more charges.

But as I understand the law, the [c]ourt can consider uncharged crimes as long as the evidence has been made available, and it was. Her testimony stands on its own. And, you know, the particularly young age of the victim in this case, more so than just somebody under the age of 13.

- 4 -

But, you know, some of the testimony in the trial makes it pretty clear that this child was chosen specifically because of her extremely young age. There is that one quote that as she started to protest when she became older, he complained that this was easier when you were younger, and you didn't put up a fight.

You know, I can't really envision a scenario that would be much worse than the facts of the case in front of the [c]ourt. So with regard to -- let me see what else. Hold on. You know, and when I look at the mitigating factors as the different parties have put forward, you know, like the fact that he did waive, you know, I do think that is important to take that into account.

It sounds like there may have been a drug issue that is floating around here, as well as perhaps some latent psychological problems related to California. You know, I don't find those mitigating factors very compelling. He was a 50-year-old man, or someone right around that range. He was 30 years removed from what happened in California.

And, you know, I understand that things like that have an impact. But at some point people are responsible for their actions. And, certainly, this was not an isolated incident. And so the mitigating factors don't weigh very heavily in the [c]ourt's eye when we consider, you know, the horrificness of what these crimes were and taking, in total, the impact of the victim, her incredible youth in that instance, the fact that he was in a position of care and trust and used that to his advantage.

So I just, you know, I'm not going to aggravate. But, certainly, when balanced, what we could call aggravating factors versus mitigating factors, I think guideline range sentences is where we're going to land on this.

N.T., Jul. 5, 2023, at 49-52.

Ramage filed a post-sentence motion arguing the verdict was against the weight of the evidence and challenging the sentence. The court denied the request for a new trial, but modified the probationary sentence for indecent assault because the original sentence exceeded the statutory maximum

- 5 -

sentence. The court resentenced Ramage to two and a half years' probation. The court denied the remainder of the motion. Ramage filed a notice of appeal.

Ramage raises the following issues:

1). Was not the verdict based on the complainant's testimony that was so contradictory, incredible and fantastical insufficient as a matter of law, as it was based on speculation and conjecture?

2). Did the trial court abuse its discretion by denying the motion for a new trial because the verdict was so contrary to the weight of the evidence as to shock the conscience?

3). Did the court abuse its discretion by failing to give proper consideration to Mr. Edward Ramage's personal needs and mitigating factors, and as a result is the sentence contrary to the fundamental norms underlying the sentencing process, non-individualized, manifestly unreasonable and excessive?

Ramage's Br. at 5.

Ramage first challenges the sufficiency of the evidence. He argues the evidence "was so contradictory, incredible, fantastical, and unreliable that any verdict of guilt could only have been arrived at through speculation and conjecture, and cannot be sustained on sufficiency grounds." *Id.* at 19. He claims, "based on the delusional testimony of an 11 year old, the elements of the crimes were not made out, and the verdict, based on mere suspicion and conjecture does not suffice to sustain a conviction." *Id.* Ramage contends that the general rule that matters of credibility are left to the fact-finder "gives way where evidence offered to support a verdict of guilt 'is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture,' such

- 6 -

that 'a jury may not be permitted to return such a finding.'" ***Id.*** at 19-20 (quoting ***Commonwealth v. Karkaria***, 625 A.2d 1167, 1170 (Pa. 1993)).

Ramage claims the victim's testimony was "the product of a delusionary mind," noting the victim's mother testified the victim had had hallucinations about a "dogman" visiting her bedroom and that the parties stipulated the victim had a history of auditory and visual hallucinations. ***Id.*** at 22. He argues that "[t]his court, and any trier of fact, should be concerned that not only may the complainant's version of things reside in fantasy, but her credibility is totally undercut and called into question about everything she is saying, as she denies having hallucinations, which is refuted by the record." ***Id.*** at 22-23. He points to the victim's testimony during a video-taped interview where she stated that "a black and white circular object came out of [Ramage's] hotdog." ***Id.*** at 23. He further notes her testimony that she was unsure whether she put her mouth on his penis because she went blank when he told her to do so, an adult walked in on them and did nothing but look at Ramage weirdly, and the assaults in the bedroom happened while there were people in another bedroom. He points out that in the videorecorded interview she said Ramage placed duct tape on her mouth, and argues that there would have been indications of the tape, but no adults saw any signs of it. He further claims that the kitchen in the house can be seen from the living room, where there had been many adults present. Ramage relies on ***Karkaria***, claiming that here, as in that case, the quality of the evidence rendered the verdict unsupportable.

When reviewing a sufficiency challenge, we "evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence." **Commonwealth v. Sebolka**, 205 A.3d 329, 336-37 (Pa.Super. 2019) (citation omitted). Evidence is sufficient where the Commonwealth has proven each element of the crime beyond a reasonable doubt. **See id.** at 337. The Commonwealth may meet its burden "by means of wholly circumstantial evidence." **Id.** (citation omitted). Additionally, the fact finder "is free to believe all, part, or none of the evidence." **Commonwealth v. Ramtahal**, 33 A.3d 602, 607 (Pa. 2011).

Generally, challenges to the verdict based on inconsistent testimony implicate the weight, not the sufficiency, of the evidence. **Commonwealth v. Smith**, 181 A.3d 1168, 1186 (Pa.Super. 2018). However, our Supreme Court has recognized "an exception to the general rule that the jury is the sole arbiter of the facts where the testimony is so inherently unreliable that a verdict based upon it could amount to no more than surmise or conjecture." **Karkaria**, 625 A.2d at 1170 (citation omitted).

In **Karkaria**, the defendant was charged with rape and other offenses based on allegations that he sexually assaulted his stepsister between April 9, 1984, and September 19, 1984, while he was babysitting her. 625 A.2d at 1167, 1171. The defendant was 16 years old, and the complainant was 8. At trial, the complainant testified that the assaults "occurred on a regular weekly basis for over three years and occurred in exactly the same manner on each

occasion." *Id.* at 1168. She said the incidents took place while her parents were out and defendant, who was her stepbrother, was caring for her, and although her brother was allegedly present, "he was never aware of what was transpiring." *Id.*

However, the complainant was unable to provide details concerning any other instance of assault, recall having been penetrated, or specify when or how the assaults may have occurred. *Id.* at 1171. The complainant also testified that she never experienced pain during the sexual assaults and never objected to being in the defendant's care. *Id.* at 1168. On appeal, our Supreme Court explained:

> In order for the jury in this case to have concluded that [the complainant] was forcibly raped by [the defendant], the jury would have had to conclude that [the complainant] had been forced to submit to sexual intercourse at least once between April 9, 1984 and September 19, 1984. Since there was no direct evidence of sexual intercourse between those dates, the jury in order to convict, would have had to conclude, beyond a reasonable doubt, that the [complainant] had been forced to submit to sexual intercourse over 300 times, without ever feeling pain, without any physical evidence to support the contention that she was so victimized, and without any specific recollection by [the complainant] as to a date certain upon which even one of the several hundred assaults occurred.

*Id.* at 1170-71. The Court further noted that the complainant "insisted that the assaults only occurred when [the defendant] was babysitting and yet she also admitted that during the time period charged in the indictment (April through September 1984), [the defendant] no longer acted as the babysitter." *Id.* at 1171. It noted that the complainant "corroborate[d] [the defendant's]

- 9 -

testimony that not only was he no longer the babysitter in 1984, but that he was rarely even in the family home during that time period." *Id.* The Court further noted that the complainant "offered one scenario, and one scenario only, for each of the 300 or more alleged incidents of sexual assault." *Id.* The Court also pointed out that the initial complaints to law enforcement "coincide[d] precisely with the pending reconciliation of [the complainant's] mother and stepfather" and the complainant had "repeated[ly] express[ed] hatred of her stepfather." *Id.* The Court thus found the evidence insufficient.

Here, the trial court found the evidence sufficient, reasoning that although some inconsistencies existed in L.B.'s accusations, they were not fatal to the conviction:

> The [c]ourt notes there was some level of inconsistency between L.B.'s accusations in the PCA forensic interview, which was conducted in November 2020 when L.B. was just shy of 9 years old, compared with her trial testimony, which was given more than two years later in December 2022 when she was 11 years old. However, the accusations consistently established each element of the crimes charged. In both instances, she described multiple events wherein Mr. Ramage instructed her to fondle him to the point of ejaculation, and other instances where she would disrobe and he would rub his penis against various parts of her body "going back and forth" on her, including her "bump" (where she goes poop) and "sometimes went between [her] cheeks." Ex. C-8 (part 1), at 1:00:38-1:01:25, 1:06:45-1:10:49; see also N.T., 12/20/2022, at 97. The fact that there were inconsistencies is not fatal to Commonwealth's ability to prove beyond a reasonable doubt that the defendant committed the crimes for which he was convicted.

Tr.Ct.Op. at 8-9.

- 10 -

We agree. In *Karkaria* the trial court rendered a verdict based upon vague and contradictory evidence that failed to establish the elements of the crimes charged. Here, the evidence was not vague and contradictory that it failed to prove guilt beyond a reasonable doubt. Rather, the fact finder heard the inconsistencies and credited L.B.'s testimony, which established that Ramage committed the sexual offenses.

Ramage next contends that the verdict was against the weight of the evidence and the trial court abused its discretion in denying his motion for a new trial. He argues that "[d]ue to the incredible and fabulous nature of the complainant's testimony, it is abundantly clear that more than a reasonable doubt was raised as to exactly whether the Appellant committed the acts alleged." Ramage's Br. at 20. He argues a new trial is required so that justice may prevail.

We review a challenge to the weight of the evidence for an abuse of discretion. *See Commonwealth v. Johnson*, 192 A.3d 1149, 1152-53 (Pa.Super. 2018). "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none or some of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Cramer*, 195 A.3d 594, 600 (Pa.Super. 2018) (quoting *Commonwealth v. Talbert*, 129 A.3d 536, 545 (Pa.Super. 2015)). To succeed on a weight claim, "the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the [trial] court." *Talbert*, 129 A.3d at 546 (citation omitted).

The trial court found the verdict was not against the weight of the evidence:

> Defense argues that the verdict was against the weight of the evidence because L.B.'s testimony was . . . "so fabulous, inconsistent, and incredible." Stmt. of Errors, November 28, 2023. In particular, Defense cites to the evidence that L.B. denied having hallucinations, that she described a "black and white circular object" coming out of Mr. Ramage's penis, that she said her memory was blank about whether or not she put his penis in her mouth, that she described an incident where an adult walked in during the start of an assault and did nothing but leave the room, that she described assaults taking place while multiple adults were nearby without intervening, that she described being taped on the mouth but no one ever noticed any physical marks on her, and that, during the PCA interview, she denied that Mr. Ramage's penis touched anything other than her hand and thigh, but at trial she testified to repeated anal and vaginal penetration.
>
> The [c]ourt disagrees with some of Defense's characterizations of the evidence. Defense contends that when Mr. Ramage was sexually assaulting L.B., an adult walked in on them. This does not accurately recount L.B.'s testimony. The adult walked into the kitchen at the point that Mr. Ramage was in the process of unbuckling his belt, and "he had to re-buckle it quickly because someone had walked in." N.T., 12/20/2022, at 99. That an adult witnessed another adult unbuckling a belt in the presence of a child is not in itself necessarily an event that would lead someone to suspect sexual assault was occurring. As described by L.B., the adult witnessed an ambiguous event that someone could brush off as innocuous, particularly in the context of family members.
>
> Furthermore, while Defense accurately describes that during the PCA forensic interview L.B. denied that Mr. Ramage's penis touched any other part of her body other than her hand, Defense ignores the other portions of that same interview where L.B. described how Mr. Ramage would rub his penis against various parts of her body "going back and forth" on her, including her "bump" (where she goes

- 12 -

poop) and "sometimes went between [her] cheeks." Ex. C-8 (part 1), at 1:00:38-1:01:25, 1:06:45-1:10:49; *see also* N.T., 12/20/2022, at 97.

Ultimately, all of the other issues argued by Defense come down to the question of witness credibility. It is the factfinder's prerogative to decide the amount of weight to place on suppositions of a victim's credibility. The evidence need not dispel all possibilities of innocence, doubts, and credibility issues.

Defense points to L.B.'s denial of her psychological history of auditory and visual hallucinations as an indication of unreliability. It is not unsurprising that an 11-year-old would be hesitant to admit in open court to having hallucinations. Although L.B. denied having hallucinations, she acknowledged having nightmares about Mr. Ramage. Moreover, her mother explained that the hallucinations occurred when L.B. came to her "in the middle of the night screaming, crying, with this hallucinations, or whatever it was[.]" N.T., 12/21/2022, at 26-27 (emphasis added). Also, it is well-settled law that when a finder of fact determines that a witness testified falsely about a material point, th[ey[ can choose to disbelieve the rest of the witness' testimony, but the finder of fact is not required to do so.

Some of the testimony Defense characterized as "fanciful" can be understood as a young child struggling to describe things beyond their understanding. For instance, L.B. described black and white circular object coming from Mr. Ramage's penis as part of recounting an episode of anal penetration. As Commonwealth argued in its closing, it is not absurd to conclude this description may pertain to a mixture of fecal matter and semen.

Defense also contends that the fact that multiple adults were present in the house during most of the alleged incidents places these accusations beyond the pale. However, L.B. explained that the events took place outside of the presence of other adults. She repeatedly stated that Mr. Ramage would sexually abuse her behind closed doors or when other adults were not around. She explained that other events occurred in locations out of the line of sight of others. In both the PCA forensic interview and during trial, L.B. explained that the incidents in the kitchen occurred in

a corner that was blocked from people's view. Ms. Ramage corroborated this fact in her testimony, stating[,] "[Y]ou can't see the whole kitchen." N.T., 12/21/2022, at 47.

The [c]ourt acknowledges that there are inconsistencies in L.B.'s testimony, but none are so clearly of greater weight that to ignore them or give them equal weight would deny justice to Mr. Ramage. Inconsistencies within testimony or between testimony and prior statements are not unusual in any case, and particularly so in a case involving a young child and a delay of about 4-7 years between the time of the incidents and the time of trial. The young age of L.B. (less than seven years old at the time of the incidents) also explains her inability to recall certain details or events. Despite all of these challenges, the accusations have remained generally consistent.

The [c]ourt had the opportunity to consider all of the competing evidence. After consideration of everything, the factfinder determined that L.B.'s testimony was truthful and accurate and the totality of evidence was adequate to prove the elements of the crimes charged beyond a reasonable doubt. The evidence in support of the verdict is not so tenuous, vague, or uncertain that the resulting verdict shocks the conscience, nor does it deny justice; therefore, the verdict is not against the weight of the evidence.

Tr.Ct.Op. at 10-13 (some citations omitted and emphasis omitted).

The court did not abuse its discretion in denying the motion for a new trial. Here, considering the evidence admitted at trial, the court permissibly found that the verdict does not shock the conscience.

In his final claim, Ramage challenges the discretionary aspects of his sentence. He argues the court sentenced him to an unreasonable sentence by failing to properly consider his alcohol and substance abuse problems and rehabilitative needs and that the sentence imposed was contrary to the fundamental norms underlying the sentencing process, as it was not

- 14 -

individualized and was manifestly unreasonable and excessive. He maintains that "sex offenders tend to serve approximately 80% of their minimum in state custody," which would result in Ramage being incarcerated until he was 82 years old. Ramage's Br. at 32. Ramage outlined his childhood and history, including his drug addiction, which started when he was a teenager. He argues the trial court did not consider his alcohol and substance abuse problems. He maintains the court "exclusively focus[ed] on [Ramage's] criminal conduct rather than his rehabilitative needs or mitigating circumstances." *Id.* at 38. Ramage relies *Commonwealth v. Coulverson*, 34 A.3d 135 (Pa.Super. 2011), arguing the sentence imposed was "virtually a life sentence that was unreasonable and excessive especially in light of the mitigation [evidence] presented." *Id.* at 40.

Ramage challenges the discretionary aspects of his sentence. Before reviewing the merits of a challenge to the discretionary aspects of sentence, this Court must first determine whether: "(1) the appeal is timely; (2) the appellant has preserved his issue; (3) his brief includes a concise statement of the reasons relied upon for allowance of an appeal with respect to the discretionary aspects of his sentence; and (4) the concise statement raises a substantial question whether the sentence is inappropriate under the Sentencing Code." *Commonwealth v. Green*, 204 A.3d 469, 488 (Pa.Super. 2019).

Here, Ramage filed a timely appeal, preserved his claim in a post-sentence motion, and included in his brief a concise statement of reasons

relied upon for allowance of appeal in his brief. We further find he raises a substantial question for our review. In his concise statement for reasons allowed for on appeal, Ramage maintains that his aggregate sentence of 387 to 774 month's incarceration is unreasonable and excessive, the court failed to impose an individualized sentence, and the court failed to follow the principle that the sentence should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the victim and community, and the defendant's rehabilitative needs. Such a claim raises a substantial question. **See Commonwealth v. Caldwell**, 117 A.3d 763, 770 (Pa.Super. 2015) (challenge to consecutive sentence coupled with claim court failed to consider rehabilitative needs raises substantial question); **Commonwealth v. Ahmad**, 961 A.2d 884, 887 (Pa.Super. 2008) (claim court failed to consider individualized circumstances raises substantial question).

"Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion." **Commonwealth v. Edwards**, 194 A.3d 625, 637 (Pa.Super. 2018) (citation omitted). An abuse of discretion occurs where "the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision." **Id.** (citation omitted). In imposing a sentence, the sentencing court must consider "the protection of the public, the gravity of the offense as it

relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S.A. § 9721(b).

Where the court has the benefit of a presentence investigation report ("PSI"), we presume it was aware of all appropriate sentencing factors and considerations and deem the requirement that it place its reasoning on the record to be satisfied. **Commonwealth v. Johnson-Daniels**, 167 A.3d 17, 26 (Pa.Super. 2017). In conducting appellate review, we may not reweigh the sentencing factors and impose our own judgment in place of that of the trial court. **Commonwealth v. Macias**, 968 A.2d 773, 778 (Pa.Super. 2009).

Ramage contends the court failed to consider the Section 9721(b) factors or properly weigh mitigating factors. We disagree. At sentencing, the court stated it reviewed the PSI, the SOAB assessment, the evidence from the SVP hearing, the parties' memoranda and counsel's statements at sentencing, Ramage's statements, the victim's testimony, and the sentencing guidelines:

> [T]he presentence report and investigation of prior record score; the SOAB assessment and the entirety of the evidence from the SVP hearing; the sentencing memo submitted by the Commonwealth and Defense; the mitigation memo submitted by the Defense; statements made by the Commonwealth and Defense Counsel in this hearing; statements made by Mr. Ramage including the statement related through his attorney; statements made by the victim and on behalf of the victim.
>
> So[,] there was no victim impact statement testimony, but the Court has considered the victim's testimony during the trial, as well as the sentencing guidelines.

N.T., 07/05/2023, at 49-50. The court also inquired about Ramage's prior criminal history and substance abuse. **See, e.g., id.** at 25, 34-35 (showing

the court's inquiry of the context of his prior criminal history and clarifying seemingly conflicting statements regarding Mr. Ramage's substance abuse history). The record establishes the court considered the sentencing factors and the mitigating circumstances prior to imposing sentence.

Ramage next maintains the court did not impose an individualized sentence and challenges the consecutive nature of the sentences. He maintains the court imposed a *de facto* life sentence.

The court did not abuse its discretion. The court found it followed the guidelines, imposed some sentences concurrently, and the fact that the sentence may be a *de facto* life sentence was due to Ramage's age and prior criminal history:

> Here, the [c]ourt sentenced Mr. Ramage to an aggregate sentence of 387-774 months['] (32.25-64.5 years) incarceration followed by 2½ years['] probation. The [c]ourt acknowledges that this result constitutes a *de facto* life sentence which will subject Mr. Ramage to a term unlikely to end during his natural life span or perpetually subject him to the discretion of the Board of Probation and Parole. N.T., 10/31/2023, at 23-24 (noting Defendant's age as 56 years old and that sentence would not terminate during his natural lifespan).
>
> However, simply because a sentence results in a *de facto* life sentence, it does not automatically mean that the sentence is manifestly unreasonable or excessive or that the court otherwise abused its discretion. Cases where a *de facto* life sentence has been struck down as manifestly unreasonable have involved non-violent crimes or cases where there were significant defects in the sentencing process. In ***Commonwealth v. Dodge***, the court expressly stated that it had the intent [to] imprison the defendant for the rest of his life, and the court crafted a sentence designed to accomplish that desired result. In ***Commonwealth v.***

- 18 -

*Coulverson*, a *de facto* life sentence was struck down as manifestly unreasonable and excessive even when the crimes involved were violent sex crimes. There, the sentencing court failed [to] consider the rehabilitative needs of the defendant, failed to consider mitigating factors, and failed to provide any reasoning for the sentence.

In contrast, the Superior Court of Pennsylvania in subsequent non-precedential opinions has distinguished *Coulverson* from matters where the sentencing court has carefully considered all relevant sentencing factors. *See, e.g., Commonwealth v. Degarmo*, No. 642 MDA 2021, 2022 WL 3332618, at *6 (Pa. Super. Ct. August 12, 2022) (upholding an aggregate term of 31 to 62 years incarceration for sexualized communications and touching of a 10-year-old, stating that "[t]he facts giving rise to the crimes and criminal histories in [*Coulverson*] are inapposite to the instant case."); *see also, Commonwealth v. Jones*, No. 719 WDA 2022, 2023 WL 3581487, at *4 (Pa. Super. Ct. May 22, 2023) (upholding an aggregate term of 21 to 46 years['] incarceration for multiple repeated acts of sexual abuse, distinguishing the matter from *Coulverson* because: (1) the trial court offered ample explanation for its sentence; (2) the maximum sentences, the length of the conduct, and the rehabilitative needs different from those in *Coulverson*; and (3) defendant "sexually assaulted the victim, his stepdaughter, not for one night but for four years[.]").

As with the other cases post-*Coulverson*, the [c]ourt in the present case considered all of the statutorily required sentencing factors, as well as the plethora of information about Mr. Ramage presented at the sentencing. *See* Discussion, supra, at 13-15. Thereafter, the [c]ourt imposed an individualized sentence on Mr. Ramage and explained its reasoning behind the sentence at the time it was imposed. N.T., 07/05/2023, at 51-52.

As the [c]ourt noted at sentencing, the potential for Mr. Ramage's rehabilitation seems limited. This was not Mr. Ramage's first sex offense conviction. He was previously convicted of rape in California and served nearly a decade for that crime. Also, the facts of the present case were especially troubling. This was not an isolated incident. L.B. recounted years of repeated abuse while she was between

the ages of four and seven. Each conviction could be sustained based on separate incidents as recounted by L.B. Mr. Ramage is not entitled to a "volume discount" for his separate crimes. The mitigating factors as presented by Defense were not compelling to the [c]ourt on balance.

The [c]ourt did not set out to craft a sentence that would result in a life sentence. The sentence followed the standard guideline range for each conviction. Also, the [c]ourt did not impose the highest possible sentence permitted by law, and the [c]ourt ordered several sentences to be served concurrently. The *de facto* life sentence which resulted in the present case was due to the fact that Mr. Ramage is a middle-aged man with a serious criminal history who has been convicted of multiple first-degree felonies in the present case, one of which includes a maximum sentence of 40 years['] incarceration.

Tr.Ct.Op. at 16-18 (footnote and some citations omitted).

There was no abuse of discretion in sentencing. The court imposed an individualized sentence and considered all factors before imposing sentence. The case is not analogous to cases vacating *de facto* life sentences, as the court considered the crimes and Ramage's background, and sentenced within the guidelines. It did not abuse its discretion.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/30/2025

- 20 -