J-S39033-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
  :
  :
v.   :
  :
  :
  :
ALBERT CASTAPHNEY   :
  :
Appellant   :   No. 187 WDA 2024

Appeal from the Judgment of Sentence Entered September 26, 2023
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0005560-2019

BEFORE: DUBOW, J., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.:       **FILED: NOVEMBER 25, 2024**

Appellant Albert Castaphney appeals from the judgment of sentence imposed following his convictions for aggravated assault, strangulation, unlawful restraint, and possessing an instrument of crime (PIC).[1] Appellant challenges the sufficiency of the evidence and the discretionary aspects of his sentence. After review, we affirm on the basis of the trial court's opinion.

We adopt the trial court's summary of the underlying facts and procedural history of this matter. *See* Trial Ct. Op., 3/15/24, at 1-10. Briefly, Appellant and Torie Miesko (the victim) were in a relationship and had a child together in 2018. Between April 23, 2019 and May 6, 2019, while Appellant, the victim, and their six-month old child were living together in Appellant's grandmother's house, Appellant used threats and recurring physical abuse to

---

[1] 18 Pa.C.S. §§ 2702(a)(1), 2718(a)(1), 2902(a)(1), and 907(a), respectively.

prevent the victim from leaving the house despite the victim's attempts to escape. During this two-week period, Appellant struck the victim with his hands, a broomstick, a sledgehammer, and cans of vegetables, and Appellant abused the victim while she was holding their six-month-old child. Appellant also prevented the victim from eating and sleeping. When the victim was finally able to escape, she ran to a neighbor's house with the baby. The victim was transported to the hospital where she had to undergo oral maxillofacial surgery due to the severe injuries to her head and face. The victim also suffered numerous injuries to her eyes, neck, back, legs, and hands. Appellant was ultimately arrested, charged, and convicted of the aforementioned crimes. *See id.* at 4-10.[2]

After the trial court denied Appellant's post-sentence motion, Appellant filed a timely appeal and a court-ordered Pa.R.A.P. 1925(b) statement. The trial court filed a Rule 1925(a) opinion addressing Appellant's claims.

On appeal, Appellant raises the following issues:

1. Was the evidence at trial insufficient to support [Appellant's] conviction for aggravated assault where the Commonwealth failed to elicit testimony that [Appellant's] actions were

---

[2] On September 26, 2023, the trial court sentenced Appellant to an aggregate sentence of 180 to 360 months of incarceration followed by 10 years of probation. Specifically, the trial court sentenced Appellant to consecutive terms of 102 to 204 months of incarceration followed by 3 years of probation for aggravated assault, 60 to 120 months of incarceration for strangulation, 18 to 36 months of incarceration followed by 2 years of probation for unlawful restraint, and 5 years of probation for PIC. *See* Sentencing Order, 9/26/23, at 1-2. The trial court further ordered that Appellant was to have no contact with the victim or their child. *See id.* at 1-2.

accompanied by the [Appellant's] malice - *i.e.*, a knowing disregard of a virtually certain risk of serious bodily injury?

2. Was the evidence at trial insufficient to support [Appellant's] conviction for unlawful restraint where the Commonwealth failed to elicit sufficient testimony that the victim was actually restrained from leaving the residence?

3. Was the evidence at trial insufficient to support [Appellant's] conviction for [PIC] where the Commonwealth failed to elicit sufficient evidence that [Appellant] intended to employ the instrument (a broomstick) criminally?

4. Was [the trial court's] imposition of an order that [Appellant] have no contact with his minor child invalid because it was not tailored to the offense and consistent with his rehabilitative needs?

Appellant's Brief at 5 (formatting altered).

Following our review of the record, the parties' briefs, and relevant legal authority, we affirm on the basis of the trial court's opinion. **See** Trial Ct. Op., at 1-21. The trial court thoroughly addressed Appellant's claims of error and correctly concluded that he was not entitled to relief.[3] **See id.** Accordingly, we affirm on the basis of the trial court's opinion.

_____

[3] In Appellant's fourth issue, he presents a challenge to the discretionary aspects of his sentence, and we add that:

Challenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right. An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:

We conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, **see** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, **see**

*(Footnote Continued Next Page)*

Judgment of sentence affirmed. Jurisdiction relinquished.[4]

_____

Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.[ ] § 9781(b).

***Commonwealth v. Proctor***, 156 A.3d 261, 273 (Pa. Super. 2017) (formatting altered and citation omitted). "A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." ***Id.*** (citation omitted). Here, the record reflects that Appellant preserved his issue by raising it in his post-sentence motion, filing a timely appeal and Rule 1925(b) statement, and including a Rule 2119(f) statement in his brief. ***See id.*** Further, we conclude that Appellant's claim raises a substantial question. ***See, e.g., Commonwealth v. Glawinski***, 310 A.3d 321, 325 n.3 (Pa. Super. 2024) (providing that a claim that a no contact order was too severe under the circumstances, was not individualized, and restricted the defendant's liberty raised a substantial question) (citing ***Commonwealth v. Koren***, 646 A.2d 1205, 1208 (Pa. Super. 1994)). As such, Appellant has properly presented his issue. However, the trial court explained its rationale for the no-contact order, and for the reasons stated in the trial court's opinion, Appellant is not entitled to relief. ***See*** Trial Ct. Op. at 19-21. Moreover, we emphasize that the trial court had the benefit of a presentence investigation (PSI) report. ***See*** N.T., 9/26/23, at 35. "[W]here the trial court is informed by a PSI [report], it is presumed that the court is aware of all appropriate sentencing factors and considerations, and that where the court has been so informed, its discretion should not be disturbed." ***Commonwealth v. Edwards***, 194 A.3d 625, 638 (Pa. Super. 2018) (citation omitted and formatting altered).

[4] The parties are directed to attach a copy of the trial court's opinion in the event of further proceedings.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 11/25/2024

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY,
PENNSYLVANIA

CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA    ) CC No. 2019-5560
)
V.   )
)
ALBERT LAMAR CASTAPHNEY,   )
)
Defendant.   )

## OPINION

This is a direct appeal from the judgment of sentence entered on September 26, 2023, following a non-jury trial that took place on May 12, 2023. The Defendant went to trial on a four (4) count information that charged the following crimes: (Count 1) – Aggravated Assault (F1); (Count 2) – Strangulation (F2); (Count 3)- Unlawful Restraint (M1); and (Count 4)- Possession of Instrument of Crime (M1). This court found the Defendant guilty of all charges.

Sentencing was deferred to allow for the preparation of a Presentence Report. On September 26, 2023, the Defendant was sentenced at Count 1 to 102-204 months' imprisonment to be followed by a 3-year term of probation. A No Contact Order was imposed, prohibiting the Defendant from having contact with the victim and their minor child. The Defendant was ordered to undergo a Drug and Alcohol

1

evaluation as well as a Mental Health evaluation and was ordered to participate in any recommended treatment. He was further ordered to successfully complete the Batterer's Intervention Program. The Defendant was also ordered to comply with DNA registration as well as the Allegheny County General Rules of Probation and Parole.

At Count 2, the Defendant was sentenced to a period of 60-120 months' imprisonment, with the court imposing the same conditions of sentencing as outlined in Count 1. At Count 3, the Defendant was sentenced to a period of 18-36 month's imprisonment, to be followed by a 2-year period of probation. The same conditions of sentencing as Count 1 were also applied. The court imposed a 5-year term of probation at Count 5. All terms of imprisonment were imposed consecutively to one another, and all terms of probation were ordered to commence upon release from imprisonment and were also ordered to be served consecutively with one another. The Defendant received 1,604 days of time credit.

A timely post-sentence motion was filed on October 5, 2023. After careful consideration, this court denied the motion on January 10, 2024.[1] This timely appeal followed. Pursuant to this court's 1925(b) Order, issued on October 27, 2023, the Defendant, with the assistance

---

[1] Counsel for the Defendant informed the court via email on 10/6/23 that a hearing on the motion was unnecessary.

of a new court-appointed counsel, filed a timely Concise Statement of Errors Complained of on Appeal ("Concise Statement") on February 27, 2024, which raised the following four (4) allegations of error:

A. The evidence at trial was insufficient to support Defendant's conviction for aggravated assault because the Commonwealth failed to elicit testimony that the Defendant's actions were accompanied by the Defendant's malice – *i.e.*, a knowing disregard of a virtually certain risk of serious bodily injury.

B. The evidence at trial was insufficient to support Defendant's conviction for unlawful restraint because the Commonwealth failed to elicit sufficient testimony that the victim was actually restrained from leaving the house.

C. The evidence at trial was insufficient to support Defendant's conviction for possession of instruments of crime because the Commonwealth failed to elicit sufficient evidence that the Defendant intended to employ the instrument (a broomstick) criminally.

D. This Honorable Court's imposition of an order that Defendant have no contact with his minor child is not tailored to the offense and is not consistent with the rehabilitative needs of the Defendant. *Accord Commonwealth v. Houtz*, 982 A.2d 527 (Pa. Super. 2009);42 Pa. C.S. § 9754.

(Concise Statement, pp. 1-2).


The Defendant's contentions lack merit. This court respectfully requests that the Defendant's convictions be upheld for the reasons that follow.

3

## II.  FACTUAL BACKGROUND

Torie Miesko and the Defendant were romantic partners who had a son together in 2018. (Non-Jury Trial Transcript ("TT"), held 5/12/23, pp. 44-45). Between April 23, 2019, and May 6, 2019, Ms. Miesko was "pretty much tortured for two weeks" at the Defendant's hands. (TT, pp. 45, 47-48). They had been living together with their infant son for approximately three (3) years in the second-floor bedroom of the Defendant's grandmother's house in Larimer when the abuse started. (TT, pp. 48-49, 72).

The "first thing" that Ms. Miesko remembers is being in their room when the Defendant "backhanded" her in the mouth and broke her front tooth – "then it just kind of spiral[]ed from there." (TT, pp. 48-50). Though she could not recall "the exact order" of the events that took place over the next 14 days, she does remember being "punched" and hit "in the back of the head with [full] cans" of vegetables, which caused her to bleed. (TT, pp. 50-52, 74-75). She also recounted one instance where the Defendant held her head "in between his knees and sucker punched" her "so hard" that she "blacked out" and her face "caved in." (TT, pp. 50, 74, 83).

Towards the end of the two-week period of physical abuse where she "was being beaten and tortured pretty much all day every day," she

remembers the Defendant taking a sledgehammer and hitting her on the knees and hand. (TT, pp. 53-54, 74, 76). The Defendant also used his hands to hit Ms. Miesko in her face and "everywhere." (TT, pp. 54, 74, 76).

On a couple of occasions, the Defendant strangled Ms. Miesko, and one time he wrapped both of his hands around her neck and used so much pressure that it caused her to pass out and wake up with broken blood vessels in her eyes. (TT, pp. 54-55, 63). Ms. Miesko regained consciousness after the Defendant "smack[ed]" her and threatened to kill her. (TT, pp. 54-55). On another occasion, the Defendant made her "stand there and not cry while he proceeded to swing the [wooden handle of the broom] like a baseball bat until it broke on [her] back." (TT, p. 58). The Defendant hit Ms. Miesko so hard with the broom that he injured her back to the point that she was unable to pick up her son. (TT, pp. 58-59).

During this time period where she was being abused in their room, Ms. Miesko was "barely" permitted to sleep and eat. (TT, pp. 54-55, 80). She also was not allowed to leave the house by herself and could only leave with the Defendant. (TT, p. 57). She was hardly able to walk around the house by herself. (TT, p. 81). Ms. Miesko admittedly was battling an active heroin addiction during this timeframe, and the Defendant would not allow her to go to her Suboxone appointment

5

"because he was afraid that" she "was going to tell on him[.]" (TT, pp. 57, 70, 81). The Defendant and Ms. Miesko were both using up to three to five times a day during this period. (TT, p. 81).

Ms. Miesko attempted to leave four (4) times before she was successful in her escape. (TT, pp. 56-57). First, Ms. Miesko "tried to jump off the roof" because it was located off of their back bedroom window and led to the porch below. (TT, pp. 56, 77). The jump "knocked the wind out of" her, and the Defendant caught up to her and "started kicking" her in the stomach, telling her that she "shouldn't try to run." (TT, pp. 56, 77-79). Ms. Miesko next tried to stab the Defendant and run away, but once again he "caught" her and "smashed" her "into the cement" which "messed up" her knuckles when they "caught the road." (TT, pp. 56, 61, 82-83). Another time, the Defendant's father had given Ms. Miesko "like $5" for her to leave, but the Defendant once again tracked her down. (TT, pp. 56, 79, 83).

Though the Defendant overdosed about five to seven days into the abusive period, she was not able to safely speak with the police that arrived because their attention was focused on the Defendant, and the Defendant's uncle and brother were present at the "hectic" scene. (TT, pp. 212-13).

6

On her fourth and final escape attempt, Ms. Miesko was able to run to a neighbor's house with her son when the Defendant had left the home to purchase her an "apology soda." (TT, p. 59). They called for help and the neighbor was advised to take Ms. Miesko to the emergency room at UPMC Shadyside. (TT, pp. 59-60).

Upon arrival at UPMC Shadyside, Ms. Miesko underwent a "CT of the head, cervical spine maxillofacial structures and chest, abdomen and pelvis." (TT, p. 113). The results of the scan showed "extensive facial injuries" and fractures which showed that Ms. Miesko "needed comprehensive facial trauma surgery" in the form of an "oral maxillofacial surgery" which was unavailable at Shadyside. (TT, pp. 114-123, 142). Ms. Miesko was transferred by ambulance to UPMC Presbyterian, a "level one trauma center," where she was designated as "a level two trauma," meaning she had "significant injuries requiring evaluation by a trauma service . . . ." (TT, pp. 60, 65, 113, 120).

At UPMC Presbyterian, Ms. Miesko was seen by multiple doctors from multiple departments and her injuries were photographed and documented.[2] (TT, pp. 59-67, 122-135). She required surgery to place two plates on the right side of her face due to her severe facial fractures,

---

[2] The "full sealed and certified medical records" from UPMC Presbyterian were admitted as Commonwealth's Exhibits 18 and 19, while the certified records from UPMC Shadyside were admitted as Commonwealth's Exhibits 20 and 21. (TT, pp. 107-08).

and her "mouth was wired shut" for a month due to her broken jaw. (TT, pp. 67-69, 150-52, 156, 159-62). As a result of the jaw injury, she still cannot open her jaw "to its full capacity." (TT, p. 69). She believes that injury was sustained when the Defendant held her head in between his knees and punched her. (TT, pp. 69-70).

Additionally, Ms. Miesko had: "displaced fractures of the first lumbar vertebra and the second lumbar vertebra on the left," as well as a "nondisplaced fracture of the third lumbar vertebra," which are self-healing injuries; bruising around her neck from being strangled; "severe" facial fractures" under her eye socket, jaw, and cheekbone which showed that the right side of face "had been crushed"; black eyes and a subconjunctival hemorrhage from broken blood vessels which Ms. Miesko recalled happening after she was strangled; bruising on her arm and back; marks and bruising on her legs from being beaten with the broom; bruising on her knee from being hit with a sledgehammer; and more bruising on the other side of her legs from the broom, his hands, and the vegetable cans that the Defendant had also used to hit her. (TT, pp. 62-65, 123-33, 142-56). She was at UPMC Presbyterian from May 6, 2019, through May 10, 2019. (TT, p. 133).

One of the bruises on her thigh lasted for more than a month, and Ms. Miesko has a scar and noticeable indentation as a result of the plate that had to be surgically implanted on the right side of her face. (TT, pp.

8

64, 66). She continues to experience numbness in her face from her surgery and weakness in her left hand from the Defendant hitting her "in the hand with the sledgehammer." (TT, p. 68). As a result of the Defendant's abuse, she continues to suffer from chronic back pain, PTSD, anxiety, and difficulty focusing. (TT, p. 68).

Despite the clear severity of her injuries which caused her substantial pain, Ms. Miesko was not allowed to seek any medical treatment or call any friends or family during the two weeks of hell that she endured. (TT, pp. 57, 70). She described feeling "shut down" due to the "shock" and "trauma" from the abuse that she had sustained for so long. (TT, p. 57). The abuse escalated every day, especially after each failed escape attempt. (TT, p. 60). Their son was only six (6) months old at the time that this prolonged period of abuse was taking place, and Ms. Miesko had the added fear that the Defendant would hurt their baby because the child was in the room each time that she was being assaulted. (TT, pp. 57-58). After her escape and hospitalization, Ms. Miesko had to put her son in foster care because there was no one to care for him, and it was approximately six to eight months before she was able to regain full custody of him. (TT, p. 71).

Due to the severity of Ms. Miesko's injuries, law enforcement was contacted upon her hospitalization, and they were dispatched to the Defendant's residence to arrest him for assault. (TT, pp. 85-88, 96).

9

After hearing law enforcement call his name, the Defendant exited the house through a window and took off running down the street (TT, pp. 88-90, 96). Officers gave chase and a foot pursuit ensued. (TT, pp. 89-90). The Defendant had to be tazed to submit to the arrest. (TT, p. 89). As he was being taken into custody, the Defendant commented for the officers to "be careful because he was stabbed in the chest." (TT, p. 90). The Defendant requested that the officers retrieve a shirt for him from his bedroom, and when they were inside of the room, they observed "a piece of a broken broom handle" in the doorway. (TT, pp. 99-102, 104-05). The broken pieces of the handle were collected into evidence and presented at trial. (TT, pp. 99-106).

## III. DISCUSSION

### A. The evidence was sufficient to sustain the Defendant's convictions for Aggravated Assault, Unlawful Restraint, and Possessing an Instrument of Crime.

The standard of review applicable to a sufficiency claim is well-settled. Our appellate court has explained the standard as follows:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the

10

Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder **unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.** The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, **the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.**

Commonwealth v. Antidormi, 84 A.3d 736, 756 (Pa. Super. 2014) (internal quotations and citations omitted) (emphasis added).

"This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." Antidormi, *supra*, at 756. "Although a conviction must be based on more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty." Commonwealth v. Gainer, 7 A.3d 291, 292 (Pa. Super. 2010) (internal citations and quotations omitted).

### Aggravated Assault

In his first allegation of error on appeal, the Defendant contends that the Aggravated Assault conviction cannot stand because there was insufficient evidence to show that his actions were accompanied by proof

11

of malice – *i.e.,* "a knowing disregard of a virtually certain risk of serious bodily injury." (Concise Statement, p. 1). This contention lacks merit.

Pursuant to Section 2702(a)(1), "a person is guilty of aggravated assault if he ... attempts to cause serious injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]" 18 Pa. C.S.A. § 2702(a)(1). Against the factual backdrop set forth above, the court finds that the Commonwealth presented more than enough evidence to prove that the Defendant knowingly, intentionally, and/or recklessly under circumstances manifesting extreme indifference to human life caused serious bodily harm to Ms. Miesko when he repeatedly punched her in the face, beat her with a broomstick, hit her with a sledgehammer and canned vegetables, and strangled her to the point where she lost consciousness and sustained bruising and broken blood vessels as a result.

The evidence regarding the Defendant's actions well established a "conscious disregard" for near-certain injury such that it could be said that he harbored an "actual desire to injure." *See* Commonwealth v. Kling, 731 A.2d 145, 148 (Pa. Super. 1999) ("A defendant must display a conscious disregard for almost certain death or injury such that it is tantamount to an actual desire to injure or kill; at the very least the

12

conduct must be such that one could reasonable anticipate death or serious bodily injury would likely and logically result.").

The Defendant's malice is further highlighted by consideration of the substantial disparity in their size and strength. *See* Commonwealth v. Burton, 2 A.3d 598, 602 (Pa. Super. 2010) (noting propriety of considering whether the defendant "was disproportionately larger or stronger than the victim" in analyzing intent to injure). The evidence established that, at the time of the abuse, Ms. Miesko was 5'2 and weighed approximately 100 pounds while the Defendant was 5'9 and 158 pounds. (TT, pp. 196-97, 211-12). The Defendant essentially used a very petite victim as his punching bag, and the medical evidence unquestionably established that Ms. Miesko's injuries were not slight or the product of a minor scuffle but rather were substantial and life altering.

Ms. Miesko's facial injuries were incredibly severe and will permanently impact her. She underwent surgery for shattered bones in her face and will have a metal plate in her face for the rest of her life. She also has a noticeable disfigurement of the right side of her face which presents as sunken in, and she continues to suffer from facial nerve injuries. Ms. Miesko's testimony regarding the substantial and protracted pain that she continues to experience due to her back injury caused by the broomstick further proves the force that the Defendant

used, which in turn shows his intent to seriously injure her through his actions.

While the Defendant took the stand and provided a self-serving account of events aimed at minimizing his conduct, this court did not find his testimony to be the least bit credible. (TT, pp. 175-207). The Defendant characterized the nature of their relationship as a "very toxic" and "unhealthy drug use relationship." (TT, pp. 178, 183, 194). He admitted to hitting Ms. Miesko with the can of vegetables but claimed that he did so out of self-defense after she pulled his hair. (TT, pp. 178-80, 194). He admitted to smacking her with a broomstick but claimed that it was to defend himself against her wielding a pocket-knife against him. (TT, p. 182, 195).

The Defendant testified that he "100 percent" punched Ms. Miesko in the face but claimed it was to prevent her from harming their son when he thought that she was going to step on their baby. (TT, pp. 183, 189, 191, 195, 200-02). The Defendant denied that he ever prevented Ms. Miesko from leaving the home and claimed that she accidentally fell off the roof. (TT, pp. 183, 189, 191, 203-06). The Defendant also admitted that he had a sledgehammer but denied using it against her, and he denied ever strangling her. (TT, pp. 189-91).

14

In one breath, the Defendant testified that he admits "responsibility for everything, every injury that she had other than her inflicting it on herself . . . ." but then denied responsibility for her facial injuries. When confronted with the pictures of the bruises on her leg, the Defendant responded, "where did those come from?" and surmised that they must have been when she fell off the roof. (TT, pp. 202-06).

The court found the Defendant's testimony to be riddled with lies and viewed it as nothing more than a last-ditch attempt to deflect blame and responsibility for his barbaric conduct. The Defendant's demeanor on the stand was that of an individual who was attempting to turn the tables and paint himself as the victim. Having had the opportunity to carefully study the tone, demeanor, and testimony of each party, there is no question in this court's mind as to who was telling the truth about the events that transpired in that house. The court watched the victim as she trembled from fear and trauma while recalling the harrowing events. Her testimony was substantially corroborated by other objective evidence, which include her medical records and the testimony of her treating physicians. The fact that the Defendant fled when law enforcement attempted to arrest him only further serves to bolster the credibility of her testimony and highlight the Defendant's consciousness of guilt for his crimes.

15

## Unlawful Restraint

The Defendant next contends that the evidence failed to prove that "the victim was actually restrained from leaving the house." (Concise Statement, p. 1). This court disagrees.

Considering the mental and emotional abuse sustained in conjunction with the physical abuse, the court found Ms. Miesko's testimony that she was not allowed to leave the house without the Defendant to be highly credible. She testified that she attempted to escape four times before she was finally successful. After one of her failed escape attempts where she jumped off the roof, the Defendant kicked her in the stomach and warned her that she "shouldn't try to run." (TT, pp. 56, 77-79). The evidence was clear that the Defendant repeatedly hit Ms. Miesko, threatened to kill her, strangled her to the point of unconsciousness and broke blood vessels in her eyes, and would not let her leave the house alone.

While Ms. Miesko may not have been physically tied up in restraints, the psychological and physical abuse combined with the fear of reprisal following any failed escape attempt sufficed to keep her captive and restrain her freedom of movement because the Defendant created a circumstance where she "was exposed to a risk of serious bodily injury" if she tried to leave the house without him. *See* 18 Pa.

16

C.S.A. § 2902(a)(1) (a person commits Unlawful Restraint when the person "knowingly ... restrains another unlawfully in circumstances exposing [the other person] to risk of serious bodily injury[.]"). *See* Commonwealth v. Harbold, 260 A.3d 134, 2021 WL 2933141, at *4-5 (Pa. Super. 2021); Commonwealth v. McBall, 463 A.2d 472, 474 (Pa. Super. 1983). Accordingly, the evidence was sufficient to sustain the Defendant's conviction for Unlawful Restraint.

*Possession of an Instrument of Crime*

Finally, the evidence was sufficient to prove that the broomstick that the Defendant broke on the back of Ms. Miesko was possessed and used as an instrument of crime. As most recently reiterated by our Superior Court:

> For PIC, the Crimes Code provides: "A person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally." 18 Pa.C.S.A. § 907(a). An instrument of crime is defined as: "(1) Anything specially made or specially adapted for criminal use[; or] (2) Anything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have." Id. § 907(d) (definitions). **An object may be an instrument of crime if it is used toward a criminal end, even if the object is not commonly used for criminal purposes**. See, e.g., Commonwealth v. Magliocco, 883 A.2d 479, 487-89 (Pa. 2005) (concluding that a PIC conviction was appropriate where the defendant swung a baseball bat at two young girls even without a showing that a baseball bat is commonly used for criminal purposes).

17

Commonwealth v. Bridget, 2024 WL 512285, at *4 (Pa. Super. 2024) (emphasis added).

Ms. Miesko's testimony well established that the Defendant used the broomstick for the criminal end of committing a serious assault. When asked about the specifics regarding what the Defendant would do with the broomstick, she testified: "He made me stand there and not cry while he proceeded to swing the broom like a baseball bat until it broke on my back." (TT, pp. 50, 58). Ms. Miesko experienced so much pain from the broomstick assault that she could not pick up her six-month old son. (TT, p. 58).

Moreover, Ms. Miesko's testimony about the criminal use of the broomstick was corroborated by law enforcement's observation of the broken broomstick at the residence, and the broken broomstick was presented as evidence at trial. (TT, pp. 102, 105). Medical evidence corroborated the lumbar fractures that she sustained from the broomstick, and medical opinion testimony established that such injuries were entirely consistent with an assault with a broomstick. (TT, pp. 124-25, 128-29). Caselaw is clear that the broomstick itself does not have to be an object that is commonly used for criminal purposes, and as such, the evidence was sufficient to sustain this conviction as well.

## B. The court did not abuse its discretion in imposing a No Contact Order with the Defendant's minor child.

In his final allegation of error on appeal, the Defendant contends that the court abused its discretion in imposing a No Contact Order with his son. This contention also is without merit.

"The trial court has discretion to order any reasonable conditions that are 'devised to serve rehabilitative goals, such as recognition of wrongdoing, deterrence of future criminal conduct, and encouragement of future law-abiding conduct.'" Commonwealth v. Ferguson, 2021 WL 4167920, at *4-5 (Pa. Super. 2021) (quoting Commonwealth v. Hall, 80 A.3d 1204, 1209 (Pa. 2013). "Section 9763(b)(15) of the Sentencing Code specifically provides that the court may attach conditions of probation reasonably related to rehabilitation." Ferguson, supra, at *4 (citing 42 Pa.C.S.A. § 9763(b)(15)).

"[A] sentencing court can order a no-contact condition on probation" as long as "that condition is reasonably calculated to aid in the defendant's rehabilitation." Commonwealth v. Koren, 646 A.2d 1205, 1209 (Pa. Super. 1994). "[T]his court has consistently held that no-contact conditions are neither unreasonable nor unduly restrictive of a person's liberty." Id.

19

At the Defendant's sentencing hearing held on September 26, 2023, the Commonwealth requested the imposition of the No-Contact Order against the Defendant's son, arguing as follows:

> The Commonwealth requests as conditions of probation no contact with Tori Miesko, no contact with their minor son who was present during this incident. Your Honor, Ms. Miesko testified at times she was holding the baby and the defendant would cane her, make her put the baby down in the same room while he caned his mother and broke two vertebrae in her back. So the Commonwealth does submit a no contact order with his son is also appropriate in this case.

(Sentencing Hearing Transcript ("ST"), held 9/26/23, pp. 27-28). The court agreed that a No Contact Order with the child was appropriate "at this point in time." (ST, p. 40). However, the court did not permanently prohibit contact for the duration of the Defendant's sentence, and it left open the possibility to a modification of its No-Contact Order with court approval. Specifically, the court explained:

> If at some point after you are released you wish to go through the Family Court process and see whether or not any sort of custody time or visitation time will be provided to you, you need to be aware that my order is not changed by the Family Division order. So if you are able to get some visitation or custody time with your child through the Family Division you cannot exercise any of that until I agree. So you would have to have a motion filed and I would then decide whether or not there would be any contact.
> ***
> Okay. So don't assume the Family Division automatically changes anything of mine. It does not. But if at that point it happens you can certainly come back and ask for me to change anything.

(ST, pp. 43-44).

20

The No-Contact Order was reasonably related to the Defendant's rehabilitative needs and the protection of a vulnerable child, and it was intended to incentivize the Defendant to complete all court-ordered treatment. *See* Ferguson, supra, at *5 ("The fact that the no-contact condition is modifiable by the trial court, provides incentive for Ferguson to complete the rehabilitative steps the court set forth, to engage in mental health counseling and complete parenting classes. Accordingly, we conclude that the no-contact condition of probation is reasonable and related to Ferguson's probation."). Thus, the court did not abuse its discretion in ordering such a condition.

## IV. CONCLUSION

The Defendant's contentions on appeal are without merit. Based on the foregoing discussion, the evidence viewed in the light most favorable to the Commonwealth was more than sufficient to sustain the Defendant's convictions for Aggravated Assault, Unlawful Restraint, and Possessing Instruments of Crime. This court also did not err in imposing the No Contact Order against his minor child.

BY THE COURT:

_____, J.
BETH A. LAZZARA, JUDGE

DATE: 3/15/24

21