J-A03027-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MICHAEL WILLIAMS | : | |
| | : | |
| Appellant | : | No. 1409 EDA 2025 |

Appeal from the Judgment of Sentence Entered December 16, 2024
In the Court of Common Pleas of Bucks County Criminal Division at
No(s): CP-09-CR-0002983-2023

BEFORE: BOWES, J., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY McLAUGHLIN, J.: **FILED APRIL 17, 2026**

Michael Williams appeals from the judgment of sentence entered following his guilty plea to receiving stolen property and related charges. He challenges the discretionary aspects of his sentence. We affirm.

The trial court summarized the facts as follows:

> Out of his business TDI Towing, [Williams] bought around 2.7 million dollars in stolen catalytic converters per year from people who cut them from cars in Bucks, Philadelphia, Montgomery, and Delaware counties. [Williams] re-sold them for an unknown profit to an automotive store in New Jersey . . . .
>
> A catalytic converter is a "device incorporated in the exhaust system of a motor vehicle, containing a catalyst for converting pollutant gases into less harmful ones." . . . The catalytic converter uses precious metals (rhodium, palladium, and platinum) to filter emissions from a vehicle. During the time period of the investigation in this case, the peak prices of these metals were: "rhodium . . . upwards of

_____

[*] Retired Senior Judge assigned to the Superior Court.

$29,000 an ounce, palladium . . . almost $3,000 an ounce, . . . and platinum. . . just over $3,000 [an ounce]."

[Williams] was the owner of a business called TDI Towing located at 2335 Wheatsheaf Lane, Philadelphia. His wife, Deborah Davalos, was the president of the operation. Employees of the organization [consisted mostly of family members].

[Williams] was the boss of everything that occurred at TDI Towing—he ran the catalytic converter purchase and sales operation, gave instructions to employees to run the operation, and supplied the cash for the operation. The purchasing of catalytic converters occurred 24 hours a day, 7 days a week and involved people from the street bringing in one or numerous catalytic converters at a time to sell to TDI Towing. After a van or truck was loaded with around eighty (80) to ninety (90) catalytic converters, [Williams] would travel to Hamilton Township, New Jersey around three and a half times per week to sell them to Omar and Sons Automotive.

Lisa Davalos, Debbie Davalos' sister, was nighttime security for TDI Towing. She controlled the gate to the property with a remote control during overnight hours when cutters arrived to sell catalytic converters. A child in pajamas was with her on several nights.

There was no business income reported for TDI Towing during the time the business was being surveilled by police for this case.

On one occasion, when detectives drove by the entrance to TDI Towing, there was a cutter under a Volvo recently stolen from New Jersey removing a catalytic converter. Detectives also observed a cutter arriving at TDI Towing at 4:00 or 5:00 a.m. with a hot (literally) catalytic converter wrapped in a blanket with steam rising from it as the person was rolling the catalytic converter around in water (indicating the catalytic converter had recently been cut off of a vehicle).

Detectives sent a confidential informant ("CI") into TDI Towing to sell a catalytic converter to Eric Simpson. While there, the CI told Simpson that he was almost caught stealing a catalytic converter. Simpson advised the CI which

cars were the best ones from which to steal catalytic converters. Simpson was also surveilled grinding off a plate from a catalytic converter that ascribed the catalytic converter to a U-Haul.

[Williams] was criminally charged for running this criminal enterprise from January 1, 2020, through June 8, 2023. He knew that ninety-nine (99) percent of the catalytic converters sold to TDI were stolen. He also knew "that the people that came in were drug addicts . . . and . . . they didn't . . . own any shops that would have a legitimate reason to have those catalytic converters.["] "[A]s time progressed [his employees] came up with . . . a profit sharing idea in that he ultimately paid them [thirty-three] 33 percent of what they brought in. Between 2020 and 2023, [Williams] bought approximately one hundred seventy-five (175) catalytic converters per week and paid out an average of $300.00 per catalytic converter. [Williams] paid out 2.7 million dollars for catalytic converters per year.

Trial Court Opinion, filed 8/1/25, at 1-4 (citations and footnote omitted, some alteration added).

Williams was arrested and charged with two counts of corrupt organizations and one count each of dealing in proceeds of unlawful activities, theft by unlawful taking, receiving stolen property, conspiracy – theft by unlawful taking, criminal use of a communication facility, theft of catalytic converter, and possessing instruments of crime. On June 27, 2024, the Commonwealth nolle prossed the counts for corrupt organizations and dealing in proceeds of unlawful activities. Williams entered a guilty plea on the remaining counts.

At sentencing on December 16, 2024, the court heard testimony from Detective Timothy Johnson about the investigation. Detective Johnson

testified that there were numerous local, state and federal jurisdictions that assisted throughout the investigation, including the Philadelphia Police Department, the Pennsylvania State Police, the Commonwealth of Pennsylvania Attorney General's Office, the Montgomery County District Attorney's office and detective bureau, the Delaware County District Attorney's office and detective bureau, and the U.S. Marshals. N.T. Sentencing, 12/16/24, at 26. Detective Johnson and his team conservatively estimated that Williams paid out a total of $8.2 million for the catalytic converters. *Id.* at 27. Detective Johnson testified that after law enforcement shut down TDI Towing in June 2023, the amount of catalytic converter thefts reported in Philadelphia and Bensalem substantially decreased. *Id.* at 24-25, 33-34. Detective Johnson further noted that Williams voluntarily gave a statement to the police, in which he stated that he was the boss of the operation. *Id.* at 40-41. Detective Johnson testified that Williams was cooperative and truthful during the investigation. *Id.* at 41-42.

The court next heard from defense counsel, who argued that Williams was remorseful and accepted responsibility for his crimes. *Id*. at 43-44, 59. Counsel pointed out that Williams was a 53-year-old family man, had significant childhood trauma, did not graduate from high school, and suffered from lupus. *Id.* at 43, 45-46, 51, 55, 63. Counsel emphasized that the crimes were non-violent and presented several letters from Williams's family in support of him. *Id.* at 52, 59. Counsel also stressed that Williams

"acknowledg[ed] his debt to the community" when he agreed to pay restitution to the victims. *Id.* at 69.

Next, Williams testified and took responsibility for the crimes. *Id.* at 68. He stated that he was "very remorseful" and "ashamed." *Id.* He indicated to the court that he had been a legitimate business owner for 25 years. *Id.* at 66. He also stated that he had been with his wife for almost 40 years and had three children and several grandchildren. *Id.* Williams stated that his crimes "destroyed [his] whole family." *Id.* at 67. He explained that he sold his home to pay for counsel, moved in with his daughter, and only owns one tow truck because the police "seized everything else that [he] own[ed]." *Id.* Williams was especially apologetic to his grandchildren, who he said looked up to him as a hero. *Id.*

Before imposing Williams's sentence, the court considered the sentencing guidelines. *Id.* at 74. The court acknowledged that Williams had two prior felony convictions for burglary and insurance fraud, making his prior record score three. *Id.* at 72-73, 74-75. The court further noted that the offense gravity score for the crime of receiving stolen property was eight. *Id.* at 74. The court then stated the following:

> In the mitigated range the recommendation is that I impose a sentence of nine months in jail. In the standard range the recommendation is that I impose a period of incarceration, the minimum term of which should be between 18 and 24 months in jail. And in the aggravated range the recommendation is that I impose a period of 33 months in jail.

Now, I've heard a lot of testimony today, I've heard excellent testimony about the defendant and how he treats his family, how he treats other people, and Mr. Williams said to me I'm not a bad man, and I don't think he's a bad man. I don't think he's an evil person who wants to hurt other people. Certainly he's had a long time working in a business. He works hard, protects and takes care of his family.

I listened carefully when he told me how this started, and it started innocently enough, it just expanded and kept expanding and kept expanding. This is -- the allegation in this case is that the duration was two and a half years, regularly increasing, and the scope of it just got bigger and bigger and longer and more involved. And whether or not Mr. Williams completely understood and appreciated how big it had gotten, the fact is you see the numbers, we see them when we look at what the catalytic converter theft was prior to the closing down of this business and what it is afterwards, and those just show you the intensity. And when I listened to the numbers, talking about the number of cases and the number of phone calls and how many times Mr. Williams is going over to Trenton or to the Mercer County to get rid of those converters, 90 or a hundred at the time, it's a big deal, it's a big timeline, and it involves all kinds of people.

I mean we have, on this restitution request, I think there is 157 people listed on here. That's a lot of people to have a crime committed against, and Mr. Williams has indicated to me he was the boss, he was responsible for it. I appreciated his forthrightness, and I'm not going to hurt him because of that because he came in here and he looked me in the eye and he said I'm responsible and he did it. Okay.

I have to consider several other factors, and I do so. I have to consider the gravity of the offense as it relates to the impact on the life of the community. I have to consider the difficulties and the expenditures that the government and the police had to put forth in doing this, and I consider all of those things.

But the one thing that I consider more than anything is when you see the nature of this crime and how big it is, I have to impose a sentence that does not depreciate the seriousness of the crime, and that's where it comes down.

> Because -- and I know [defense counsel] argues about a
> long-term state sentence against that, and I agree, I'm not
> going to give you a long-term state sentence, but I'm going
> to give you a sentence in the State Correctional Institution.

*Id.* at 75-78.

The court sentenced Williams on the single count of receiving stolen property to 30 to 60 months' incarceration followed by two years of probation. *Id.* at 78. No further penalty was imposed on the remaining counts. Williams filed a timely post-sentence motion, which was denied by operation of law. This appeal followed.

Williams raises the following issues:

1. Did the trial court abuse its discretion [in] failing to adequately consider mitigating factors presented at sentencing, including but not limited to [Williams's] lack of a prior criminal record, acceptance of responsibility, rehabilitative potential, employment history, and family support by sentencing to an aggravated guideline sentence without proper justification on the record by 42 Pa. C.S. section 9721(b)[]?

2. [Was] the trial court's aggravated sentence manifestly unreasonable considering the sentencing guidelines, [Williams's] specific mitigation and the lack of aggravating factors?

Williams's Br. at 3 (numbering added; suggested answers omitted).[1]

Williams's issues challenge the discretionary aspects of his sentence and will be addressed together. "The right to appellate review of the discretionary

_____

[1] Williams's reference to his "lack of a prior criminal record" in his first question presented appears to be an error. He does not argue that he lacked a prior criminal record in the argument section of his brief nor claim that his prior convictions for burglary and insurance fraud were wrongly considered by the court.

aspects of a sentence is not absolute, and must be considered a petition for permission to appeal." **Commonwealth v. Conte**, 198 A.3d 1169, 1173 (Pa.Super. 2018). Before reviewing the merits of Williams's claim, we must determine whether: "(1) the appeal is timely; (2) the appellant has preserved his issue; (3) his brief includes a concise statement of the reasons relied upon for allowance of an appeal with respect to the discretionary aspects of his sentence; and (4) the concise statement raises a substantial question whether the sentence is inappropriate under the Sentencing Code." **Commonwealth v. Green**, 204 A.3d 469, 488 (Pa.Super. 2019); **see also** Pa.R.A.P. 2119(f) (stating that an appellant who challenges the discretionary aspects of a sentence "shall set forth in a separate section of the brief a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of a sentence").

Here, Williams has complied with the first three requirements: his appeal is timely, he preserved the issues in a post-sentence motion, and his brief includes a statement of the reasons for allowance of appeal. We now turn to whether Williams has raised a substantial question.

A substantial question exists when the appellant makes a colorable argument that the sentencing judge's actions were either inconsistent with a specific provision of the Sentencing Code or contrary to the fundamental norms underlying the sentencing process. **Commonwealth v. Moury**, 992 A.2d 162, 170 (Pa.Super. 2010). Williams's Rule 2119(f) statement claims that "his sentence, which was aggravated and above the standard guidelines,

was excessive and imposed without adequate reasons on the record." Williams's Br. at 6. This presents a substantial question. ***See Commonwealth v. Macias***, 968 A.2d 773, 776 (Pa.Super. 2009) ("The failure to set forth adequate reasons for the sentence imposed has been held to raise a substantial question"). Williams's Rule 2119(f) statement further claims that his sentence was manifestly unreasonable because the court focused on the seriousness of the crime and failed to consider mitigating factors. Williams's Br. at 7. This, too, presents a substantial question. ***See Macias***, 968 A.2d at 776 ("[A]n averment that the court sentenced based solely on the seriousness of the offense and failed to consider all relevant factors raises a substantial question").

Williams argues that the trial court erred by fashioning a sentence that did not properly account for his substantial mitigation and failed to state adequate reasons on the record for imposing an aggravated guideline sentence. Williams's Br. at 5. Williams maintains the court impermissibly relied too heavily on the seriousness of the crimes in imposing his sentence. ***Id***. at 11. He points out that the offenses were non-violent; he paid his co-conspirators and did not compel their participation; no victims testified at sentencing or appeared on record; he was cooperative with the police and met with them before he was arrested; his amount of restitution was not exceptional; and he showed remorse. ***Id.*** at 5, 11.

Williams further argues that his sentence in the aggravated range of the sentencing guidelines was manifestly unreasonable. ***Id.*** at 12. He notes that

the Commonwealth did not ask for an aggravated sentence. *Id.* In his view, the court's "selection of '30' months as the proper amount is arbitrary, as any sentence within the standard range would have also sentenced [Williams] to jail for nearly or more than multiple years." *Id.* Williams also points out that "[t]he Commonwealth's task in prosecuting those responsible for the conspiracy was significantly aided by [him] and his guilty plea took responsibility for the mass of the conspiracy, accepting responsibility for it all quickly." *Id.* at 13. He argues that the court seemingly found Williams credible during his allocution, in which he expressed remorse, "but still did not give [him] an individualized sentence." *Id.*

"Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion." *Commonwealth v. Edwards*, 194 A.3d 625, 637 (Pa.Super. 2018) (citation omitted). An abuse of discretion occurs where "the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision." *Id.* (citation omitted). When imposing a sentence, the sentencing court must consider "the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S.A. § 9721(b). "In conducting appellate review, we may not reweigh the sentencing factors and impose our own judgment in place of that of the trial court." *Commonwealth v. Snyder*, 289 A.3d 1121, 1126-27 (Pa.Super. 2023).

Here, we find that the court adequately considered the mitigating factors, as well as the seriousness and duration of the crime, in determining Williams's sentence. Contrary to Williams's contention, the record reflects that the court did, in fact, adequately state its reasons for imposing the sentence. The court noted that it did not think Williams was an "evil person" and considered "excellent testimony about [Williams] and how he treats his family" and how he "works hard, protects and takes care of his family." Trial Ct. Op. at 14 (quoting N.T. at 75). The court stated that it appreciated Williams's forthrightness and "he came in here and he looked me in the eye and he said I'm responsible and he did it." *Id.* at 15 (quoting N.T. at 77). The court also considered how "big" the crime was and "the seriousness of the crime." *Id.* (quoting N.T. at 77). The court emphasized that there was no "departure" from the sentencing guidelines. *Id.* at 16. The court further pointed out that it had read and considered Williams's 30-page sentencing memorandum, as well as the numerous character letters written on Williams's behalf. *Id.* at 21. In sum, on the record, the court "considered the [s]entencing [g]uidelines, mitigating factors, [Williams's] character, [Williams's] role in the crimes, remorse and responsibility for the crime, and impact of the crimes on victims and the community." *Id.* at 16.

The record thus demonstrates that the court properly considered "the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S.A. § 9721(b). This Court may not reweigh the

sentencing factors. ***Snyder***, 289 A.3d at 1126-27. Accordingly, we discern no abuse of discretion.

Judgment of sentence affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/17/2026